Jimmy Lee HORTON, Petitioner–Appellant,

v.

Walter ZANT, Warden, Georgia Diagnostic and Classification Center, Respondent–Appellee.

No. 90–8522.

United States Court of Appeals, Eleventh Circuit.

Sept. 3, 1991.

Rehearing and Rehearing En Banc Denied Oct. 31, 1991.

Andrew L. Lipps, Swidler, Berlin, Chtd., Washington, D.C., Stephen B. Bright, Atlanta, Ga., for petitioner-appellant.

Paula K. Smith, Asst. Atty. Gen., Atlanta, Ga., for respondent-appellee.

Before JOHNSON, BIRCH and DUBINA, Circuit Judges.

JOHNSON, Circuit Judge:

The petitioner, Jimmy Lee Horton, under a sentence of death, appeals the district court's denial of his habeas petition. We reverse the district court's disposition of the case on three of the claims. In doing so, we note that each of the claims constitutes an independent basis for granting the writ.

## I. STATEMENT OF THE CASE

### A. *Background Facts*

On the evening of November 28, 1980, Jimmy Lee Horton and Pless Brown borrowed Hamp Davis' pickup truck in order to commit several burglaries. Early in the evening, Horton and Brown broke into a house and stole a black barrelled .22 caliber pistol and a television set. The pistol was unloaded. Horton and Brown brought the television set to Hamp Davis' house where Mrs. Davis helped them sell the set to one of her co-workers. The two men then left and went to Raintree Apartments where Horton and Brown broke into Ms. Sherrell

Grant's apartment. They then proceeded to steal a silver-colored pistol and some furniture. In the course of loading the furniture onto the truck, they were discovered by Ms. Grant's boyfriend, Don Thompson.[1] Thompson was shot and killed. A ballistics expert determined that Thompson was shot with a copper coated CCI bullet fired from the black barrelled pistol.

Earlier that evening Thompson and Ms. Grant went to a friend's house for dinner and drinks. Thompson escorted Ms. Grant home, but before they entered her apartment, Ms. Grant noticed the door pried open. Thompson knocked on a neighbor's door and borrowed a pistol. Thompson then entered the apartment, looked around, and went out the back door towards the parking lot. Meanwhile, Ms. Grant stood in front of her door talking to her neighbor. Just then a short black man with an "Afro" haircut[2] came around the corner of the apartment complex from the direction of the parking lot. He saw Ms. Grant; he turned around and fled. Behind this man was a taller black man with shorter hair.[3] Ms. Grant told this man that he "wasn't going anywhere." This man, according to Ms. Grant, raised a black barrelled pistol and shot at her but missed.[4] Ms. Grant quickly ducked into the neighbor's apartment. While she was hiding in the apartment, she heard what she thought was two separate guns firing.[5]

At the same time that Ms. Grant thought she heard the guns firing, Ms. Carol Baker was looking out her window and saw a gun firing from the passenger side of a truck in the parking lot. Ms. Baker was unable to identify either of the two men in the truck since the truck quickly drove away. Another resident, Mr. Robert Theil, waited until after the gunfire, then ventured outside and found Mr. Thompson's body.

In the ensuing days, the local police matched the description of the truck to Hamp Davis' truck. The police questioned Davis and he implicated Horton and Brown. The police then arrested Horton and Brown. Following the arrest, Horton's common law wife gave the police the black barrelled gun that was stolen in the burglary and used in the shooting of Thompson. A search of Horton's house pursuant to a warrant turned up Remington bullets similar to those fired at Ms. Grant, but no copper-coated CCI bullets. Horton confessed to taking part in the robbery, but claimed that Brown shot Thompson.

### B. Procedural History

#### 1. Trial

Horton and Brown were each charged with two counts of burglary and with one count of murder. They were tried separately.[6] At trial, Horton admitted to participating in the two burglaries and to shooting at Ms. Grant[7] but he claimed that Brown shot Thompson and later switched guns with him. The prosecution's case against Horton was largely circumstantial.[8] The prosecutor, Mr. Joseph Briley, emphasized to the jury that Ms. Grant saw Hor-

---

1. Don Thompson was the District Attorney for Bibb County, Georgia.

2. This description roughly described Pless Brown.

3. Apparently Jimmy Lee Horton.

4. The bullets were retrieved from a wall. The ballistics expert concluded that they were Remington bullets but that they were too badly damaged to perform any further identification. The expert testified that either the silver barrelled gun, the black barrelled gun, or any other .22 caliber gun could have fired the bullets.

5. Other witnesses could neither confirm nor deny whether two separate guns were fired. Because Thompson evidently forgot to take his borrowed gun off the safety, it is clear that Thompson did not fire his gun. The prosecutor argued during the trials that both Horton and Brown fired at Thompson.

6. Brown was found guilty on all counts and given a life sentence.

7. He was not charged with shooting at Ms. Grant.

8. The evidence as to which of the two burglars shot Mr. Thompson was so weak that Mr. Briley, the prosecutor in both Horton's and Brown's trials, told the jury in his closing during Brown's trial that, "I am not going to tell you that I know who shot the gun that put the fatal bullet into Mr. Thompson. I'm not going to tell you I know because I don't."

ton shooting at her with the black barrelled gun,[9] that the gun was found in Horton's apartment, and that Horton's story was somewhat incredible.[10] The only direct evidence against Horton came from Hamp Davis. Davis testified that Horton told him that he shot Thompson because Thompson drew a gun on Horton and it was "either him or me." Davis also testified that Brown had told him that Horton shot Thompson.[11]

The jury convicted Horton of murder. The penalty phase of the trial was extremely short. The state introduced certified copies of Horton's prior convictions for armed robbery, burglary, theft, and escape. The defense called no witnesses and offered no evidence in mitigation. The jury recommended a sentence of death.

Following the trial, Horton sought a new sentencing hearing on the basis of an affidavit by Arthur Fryer who stated that he heard Brown confess to being the one who shot Thompson. During an evidentiary hearing Fryer stated that he told no one about Brown's confession until after the trial, but then, on cross-examination, he admitted that he told Horton before the trial of Brown's alleged confession. Horton, nevertheless, claimed the evidence warranted a new sentencing hearing because the evidence was newly available since, at the time of Horton's trial, Fryer was a fugitive from justice. The trial court denied Horton's motion to grant a new sentencing hearing.

### 2. Appeals and Collateral Appeals

Horton's conviction and sentence of death was affirmed on appeal by the Georgia Supreme Court. *Horton v. State,* 249 Ga. 871, 295 S.E.2d 281 (1982), *cert. denied,* 459 U.S. 1188, 103 S.Ct. 837, 74 L.Ed.2d 1030 (1983). Horton then filed a petition for habeas corpus in state court in December of 1983. The trial court held an evidentiary hearing and then denied the writ. The Georgia Supreme Court summarily affirmed the trial court. The United States Supreme Court denied certiorari. *Horton v. Georgia,* 484 U.S. 905, 108 S.Ct. 248, 98 L.Ed.2d 206 (1987).

Horton then brought this federal habeas petition. Horton alleged 14 claims. The district court held an evidentiary hearing which focused on the *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), claim. On April 12, 1990, the district court rejected all 14 claims on the merits and then denied the petition. This appeal followed.

### II. ANALYSIS

#### A. *The Swain v. Alabama Claim*

■ Horton claims that the prosecutor violated the Equal Protection Clause of the

---

9. Ms. Grant, however, mistakenly pointed at the wrong exhibit when she was asked to identify the gun Horton was carrying. Ms. Grant mistakenly claimed that Horton was carrying Exhibit 6, the .32 caliber semiautomatic Berretta pistol found in Mr. Thompson's hands. The defense attempted to capitalize on this mistake, arguing to the jury that the black barrelled gun and the silver barrelled gun are a lot more similar in appearance to each other than either gun is to the gun found in Mr. Thompson's hands. Also, the defense argued that Mr. Horton was a considerable distance from Ms. Grant, that it was dark out, and that Mr. Horton was running away when he turned and shot at Ms. Grant.

10. Horton told the jury that he initially had the silver gun and that he later traded guns with Brown. Horton, however, changed his story several times on the witness stand. It is difficult to determine, from Mr. Horton's testimony, exactly when he had the silver gun and when he had the black gun. The only thing that is clear from the testimony is that Horton is certain that he did not have the black gun when Thompson was shot.

11. The defense, however, impeached Davis' credibility. The district attorney's office, at the time of trial, was debating whether to prosecute Davis' wife for selling the stolen television and participating in other similar sales. Davis himself and some of his brothers were initially suspects in the shooting. And, Davis was picked up for questioning after work one day and was held fourteen hours until early the next morning. During this questioning, the police did not provide him dinner until after midnight. Early in the questioning, Davis denied any knowledge of the shooting and denied lending his truck to anyone that night. After a night of questioning, he inculpated Horton and Brown and he told the police that Horton had confessed to him about being the triggerman.

14th Amendment by using the state's peremptory challenges in a racially discriminatory manner. Such a claim is governed by *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965).[12] *Swain* recognized that peremptory challenges were historically exercised in a secretive manner, and that they historically could be exercised for any reason, or for no reason at all. *Swain*, therefore, cloaked prosecutors with the presumption that they utilized their peremptory challenges in order "to obtain a fair and impartial jury." *Id.* at 222, 85 S.Ct. at 837. However, the Court held that this presumption can be rebutted by the defendant should he or she establish a prima facie case showing that the peremptory challenges were exercised in a racially discriminatory manner.

The Court held that in order to establish a prima facie case, the defendant must come forward with "[s]uch proof [that] might support a reasonable inference that [blacks] are excluded from juries for reasons wholly unrelated to the outcome of the particular case on trial and that the peremptory system is being used to deny [blacks] the same right and opportunity to participate in the administration of justice enjoyed by the white population." *Id.* at 224, 85 S.Ct. at 838. The Court held that "the defendant must ... show the prosecutor's *systematic* use of peremptory challenges against [blacks] over a period of time." *Id.* at 227, 85 S.Ct. at 839 (emphasis

added). The court suggested in dicta that the prima facie case may be established by proof that "the state has not seen fit to leave a single [black] on any jury in a criminal case." *Id.* at 224, 85 S.Ct. at 838.[13]

Our case law has, on several occasions, returned to the problem detailed in *Swain*. The threshold question that each of our cases has focused upon is what level of proof is sufficient to create the "reasonable inference" that a given prosecutor is using peremptory strikes in order to deny blacks the right to participate on juries. In *Willis v. Zant*, 720 F.2d 1212 (11th Cir.1983) (*Willis* I), this Court held that the defendant "is not required to show that the prosecutor *always* struck *every* black venireman offered to him ... but the facts must manifestly show an intent on the part of the prosecutor to disenfranchise blacks from traverse juries in criminal trials in his circuit." *Id.* at 1220 (emphasis in original). Our case law has noted that the defendant "bears a heavy burden" in making the showing. *Easter v. Estelle*, 609 F.2d 756 (5th Cir.1980). Because of this heavy burden, evidence that a prosecutor struck every black juror in one trial, *Easter*, 609 F.2d at 759, or in six trials held in the course of one week, *United States v. Pearson*, 448 F.2d 1207 (5th Cir.1971), has been held to be insufficient to demonstrate a prima facie case under *Swain*. Our Court has held that a defendant can make such a

---

**12.** While a portion of *Swain* was prospectively overruled in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Court in *Allen v. Hardy*, 478 U.S. 255, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986), held that *Swain* still governed those cases which became final prior to the Court's decision in *Batson*. Horton's conviction became final when the United States Supreme Court denied his request for a writ of certiorari in 1983. Therefore, Horton's claim is covered by *Swain*, not *Batson*.

**13.** *Swain* also stated that, while the Court was generally opposed to allowing defendants to examine a prosecutor's use of peremptory challenges, at some point the Court had to allow such an examination, because

> when the prosecutor in a county, in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be, is responsible for the removal of [blacks] who have been selected as quali-

fied jurors by the jury commissioners and who have survived challenges for cause, with the result that no [blacks] ever serve on petit juries, the Fourteenth Amendment claim takes on added significance.

*Id.* at 223, 85 S.Ct. at 837. The Court did not state that such a showing is the minimum showing that a defendant must prove in order to demonstrate a prima facie equal protection claim. As the case law of our Circuit demonstrates, lesser showings are also adequate to demonstrate a prima facie case. *See* discussion *infra*. As a result, while our case law has repeatedly cited this language, we have not used this language as a litmus test. Rather, our case law has treated this language as if it were a heuristic example, *i.e.*, an example so extreme as not to be realistic but nonetheless useful to make a point, similar to that used by practitioners of the socratic method.

showing either by coming forward with statistical evidence or by using testimony from individuals who have witnessed the prosecutor's manner of exercising his peremptory strikes. *Willis* I, 720 F.2d at 1220 n. 18.

In *Jones v. Davis*, 835 F.2d 835 (11th Cir.1988), we held that the defendant met his prima facie burden by placing into the record testimony from six defense attorneys from the criminal defense bar who stated that they thought the prosecutor's office regularly struck all or most of the blacks on the jury. *See also Love v. Jones*, 923 F.2d 816 (11th Cir.1991) (the testimony of two defense attorneys with twenty-three combined years of experience is sufficient to make out a prima facie case). The Court in *Jones v. Davis* noted that while statistical evidence would have been stronger, the impressions of these members of the criminal defense bar are adequate to support a finding that the defendant had demonstrated a prima facie case.

■ The defendant's goal in demonstrating that the prosecutor struck all or most of the blacks from criminal juries is to enable the court to infer the prosecutor's intent. *Willis* I, 720 F.2d at 1220. The defendant, in the case at hand, correctly argues that in addition to inferring the prosecutor's intent from statistics, we can infer the prosecutor's intent from the prosecutor's past allegedly discriminatory actions.

Horton has gathered considerable evidence about two incidents involving the prosecutor, Mr. Joseph Briley. The first incident involves the prosecution of Charlie Young, a black man, in 1976 in Greene County, Georgia. Evidently in Greene County, during this time period, the grand and traverse jury lists underrepresented blacks by significant margins. Mr. Briley, in his deposition in this case, admitted that he was aware, at the time of Mr. Young's prosecution, that it was unconstitutional to try an individual when cognizable groups in the general population were underrepresented on the jury lists. Nonetheless, Mr. Briley engaged in questionable tactics to foreclose a jury challenge. Mr. Young was represented by Reuben Garland, an elderly lawyer who was suffering from substantial disabilities during the trial.[14] According to the record, Mr. Garland filed a motion attacking the racial disparities in the jury pool. Seven days later, Mr. Briley set the motion for a hearing,[15] scheduling the hearing to commence within three days. Mr. Briley then was able to convince the court to deny the motion because Mr. Garland was unable to gather sufficient evidence to prove the disparity in the jury lists which existed and was not corrected until a court order was issued in another case two years later. Mr. Briley's hardball tactics clearly do not comport with the prosecutor's obligation to "do justice." The tactics, however, may be understandable, though not excusable, in light of Mr. Briley's natural desire to obtain a conviction.

The second incident is even more egregious and less defensible. Mr. Briley admitted in his deposition that he was the author of a now infamous memo designed to underrepresent blacks, women and all individuals 18–24 years old on Putnam County's grand and traverse juries. The memo lists specific numbers of individuals in these three categories and directs the clerk of the court to put a set number of individuals from each of these categories on each grand and traverse jury. The

---

**14.** This Court in *Young v. Zant*, 677 F.2d 792 (11th Cir.1982), ruled Mr. Garland's assistance ineffective. At least until after the closing of the guilt phase of Mr. Young's trial, Mr. Garland was unaware that Georgia death penalty trials were bifurcated. He adopted an

unsupportable defense to all counts and ignored [several] obvious defenses ... he conceded his client's guilt of all three crimes for which he was charged in the guilt phase of the trial; and he did so because of his mistaken belief that such an action was strategically

necessary in order to make a strong plea for mercy. Whether, on the facts of this case, such a tactical decision would have been proper under the former Georgia criminal procedure, which Garland still believed to be in effect, we can discern *no* possible reason for this conduct under the present bifurcated procedure.

*Id.* at 799 (emphasis in original).

**15.** At that time in Greene County, the district attorney set the trial calendar.

numbers were designed to underrepresent each group by a significant amount, but the disparity was intelligently designed to avoid constituting a prima facie underrepresentation under existing Fifth Circuit and Supreme Court case law. *See Amadeo v. Zant,* 486 U.S. 214, 218, 108 S.Ct. 1771, 1774, 100 L.Ed.2d 249 (1988).[16] This memo was accidentally discovered by a plaintiff's attorney who was challenging the make-up of the traverse and grand juries in Putnam County. *See Bailey v. Vining,* Civ. Action No. 76–199 MAC (M.D.Ga., Aug. 17, 1978). Horton attached to the record in this case a copy of a portion of the record from *Bailey.* In *Bailey,* the Putnam County clerk testified that the district attorney's office brought this memo over to the clerk's office and ordered the clerk to follow the memo when the office drew up the grand and traverse jury lists.[17] Mr. Briley, in the case at hand, argues that he should not be viewed as morally culpable because of this memo. Mr. Briley claims that the memo originated during the Mary Jackson case.

In that case, Mary Jackson's defense lawyer, George Lawrence, Jr., brought a jury challenge because of the great disparity between the racial and sexual composition of the jury pool and the composition of the general population. It is undisputed that Mr. Briley joined the jury challenge. Mr. Briley claims that in the course of this jury challenge he drew up this memo and presented it to Judge Jackson, who is now deceased. Mr. Briley claims that he told the judge that these numbers were the absolute minimums allowable under the case law and that he suggested that the pool should be reconstituted to reflect the population at large. Mr. Briley stated, in his deposition, that Judge Jackson, over his objection, ordered him to reconstitute the jury pool by placing the minimum numbers of blacks and women into the jury pool, and he alleges that the judge forbade him from bringing the numbers up to population norms. Horton, however, notes that there is conflicting evidence in the record on this question.[18] The district court never made a

16. Under the case law at the time of this incident, the federal courts recognized that certain disparities between the traverse jury and grand jury pools and the general population were too excessive to be consistent with rules of probability. *See Preston v. Mandeville,* 428 F.2d 1392 (5th Cir.1970). The courts allowed proof of excessive disparities to constitute a prima facie case that the jury pools were illegally constituted. *Id.* Lesser disparities were held to be acceptable because of normal variations not due to intentional discrimination. *Swain v. Alabama,* 380 U.S. at 205–06, 85 S.Ct. at 827–28. The memo, however, intentionally underrepresented the numbers of blacks, women, and young adults by listing the following numbers:

|  | Percent of Traverse Jury Pool | Percent of Population |
|---|---|---|
| Males | 60% | 48.4% |
| Women | 40% | 51.6% |
| Black | 37% | 42.1% |
| White | 63% | 51.6% |
| 18–24 age | 2% | 17.2% |

|  | Percent of Grand Jury Pool | Percent of Population |
|---|---|---|
| Males | 70% | 48.4% |
| Women | 30% | 51.6% |
| Black | 31.4% | 42.1% |
| White | 68.6% | 51.6% |
| 18–24 age | Illegible | Illegible |

17. This memo was also the subject of the dispute in *Amadeo v. Zant,* 486 U.S. 214, 108 S.Ct. 1771, 100 L.Ed.2d 249 (1988).

18. There was no record made of this hearing before Judge Jackson. Besides the late Judge Jackson, Mr. Briley, Mr. Lawrence, and Mr. Copeland, Mr. Lawrence's assistant, were present at this hearing. Both Mr. Copeland and Mr. Lawrence remember Mr. Briley joining the defense in the challenge to the jury pool and they remember Judge Jackson ordering the pool redone. Neither attorney remembers Judge Jackson telling Mr. Briley to put only the minimum numbers of blacks and women into the jury pool. Mr. Lawrence also specifically stated that he would have remembered such an order if Judge Jackson had made it.

finding of fact as to whether Judge Jackson actually ordered Mr. Briley to tamper with the numbers, and we decline to make any factual finding on appeal.

Nevertheless, even if we were to assume Mr. Briley's version of the story was true, we cannot condone his behavior. First, it is suspicious that Mr. Briley gave Judge Jackson a memo listing the minimum numbers of blacks and women that would survive a jury challenge. Second, the mere fact that a judge orders a prosecutor to engage in unconstitutional discrimination on the basis of race and sex does not make the behavior right. A prosecutor has a duty to "do justice" and at the very least he should place his objections on the record and not engage in the subsequent cover up denounced by the Supreme Court in *Amadeo*.

Although these two incidents are relevant to determining Mr. Briley's intent when he later engaged in the peremptory strikes, this evidence alone is not sufficient to constitute a prima facie case under *Swain*.

However, Horton also supplements these incidents with a statistical analysis of Mr. Briley's peremptory strikes. Mr. Briley has been district attorney since 1974 for the Ocmulgee Judicial Circuit, which covers eight Georgia counties.[19] In Baldwin County, where 37.3% of the residents are black, the record shows that from 1974 to 1981, Mr. Briley used his peremptory strikes to strike 462 blacks and 164 whites in non-capital cases. In capital cases, he used his peremptory strikes to strike 152 blacks and 26 whites. In Green County, where, according to the 1980 census, 52.6% of the residents are black, Mr. Briley has used his peremptory challenges to strike 74 blacks and 22 whites in non-capital cases and 47 blacks and 2 whites in capital

cases.[20] In Jasper County, where 59.4% of the residents are black, Mr. Briley used his peremptory challenges to strike 58 blacks and 45 whites in non-capital cases and 7 blacks and 0 whites in capital cases. In Jones County, where 32.2% of the residents are black, Mr. Briley used his peremptory strikes to strike 137 blacks and 103 whites in non-capital cases and 33 blacks and 2 whites in capital cases. In Wilkerson County, where 44.9% of the residents are black, Mr. Briley used his peremptory challenges to strike 60 blacks and 56 whites in non-capital cases and 6 blacks and 4 whites in capital cases. Finally, in Putnam County, Mr. Briley used 17 of his peremptory challenges to strike blacks and 6 to strike whites in capital cases.[21] In short, between 1974 and 1981, Mr. Briley exercised 1,580 peremptory strikes, 1,095 of them (70%) against black venire members. These 1,580 peremptory strikes can be broken down into capital and non-capital cases. Mr. Briley exercised 234 peremptory strikes in capital cases, 184 of them (79%) against black venire members. Finally, Mr. Briley exercised 1,346 peremptory strikes in non-capital cases, 911 of these strikes (67.7%) against black venire members.

In the three counties with sufficient data to provide a meaningful sample (Baldwin, Green, and Jones counties), Horton's statistician, Dr. Liberson, compared the racial breakdown of Mr. Briley's use of peremptory strikes to the population statistics. Dr. Liberson concluded that the likelihood, in each of these three counties, that Mr. Briley was using a race neutral method for exercising the strikes was less than 1 in 100,000.

Dr. Liberson also broke the data down into other helpful statistics.[22] Dr. Liberson

---

**19.** Due to limits in record keeping, data is not available for some of the cases tried in some of the smaller counties. The data that is available is attached to this opinion as Appendix A.

**20.** There is some dispute in the record, but Mr. Briley may have participated in the striking of ten additional blacks (and 0 whites) in the Charlie Young case. Mr. Briley claimed to have supervised, but not participated in, the striking of the jury in that case.

**21.** Mr. Briley also tried three capital cases in Bibb County, outside of his usual judicial circuit. In those three cases, he struck 18 blacks and 9 whites.

**22.** We held in *Willis* I that the determination of whether the prosecutor was violating the Equal Protection Clause turns on his or her behavior in all of the cases that he or she prosecuted. *Willis* I, 720 F.2d at 1220. However, that does

found that in capital cases involving black defendants, Mr. Briley used 89.9% of his peremptory strikes (169 out of 189 strikes) against black venire members. In capital cases involving a black defendant and a white victim, Mr. Briley used 94.1% of his peremptory strikes (96 out of 103 strikes) against black venire members. Similarly, in non-capital cases involving a black defendant, Mr. Briley used 85% of his strikes (557 out of 659 strikes) against black venire members. Because the strike rate differed when the defendant was black and when the defendant was white, Dr. Liberson compared the rate at which Mr. Briley struck black venire members in cases where the defendant was black with the strike rate in cases where the defendant was white and concluded that the likelihood that Mr. Briley was exercising his peremptory challenges in a manner not related to the race of the defendant was less than 1 chance in 100,000.

The state disagreed with Dr. Liberson's conclusions for several reasons. First, the state attacks Dr. Liberson's data. The state's statistician, Dr. Katz,[23] had different tallies on the number of strikes. However, the state stipulated that Horton's jury strike information was correct[24] and Dr. Katz admitted in his deposition that the combined effect of all the alleged errors was marginal.

Second, the state argues that Horton's methodology is flawed because Dr. Liberson failed to control for various variables, including the individual's attitude towards law enforcement and the death penalty. Such a criticism may in fact be valid if there was only a marginal difference between Mr. Briley's strike rate and the percentage of blacks within the general population. However, when the difference is statistically significant, the criticism lacks persuasive force. From the data we can draw only one of two conclusions: either Mr. Briley made his peremptory strikes based on the race of the venire members or Mr. Briley made his peremptory strikes based upon some set of legitimate factors and these legitimate factors by sheer coincidence had virtually a one-to-one correlation with the race of the venire members. However, the only conclusion that we are willing to draw from our case law is that courts cannot make a blind leap of faith that there exists some set of legitimate factors which correlates one-to-one with the race of the venire members. Our unwillingness to make such an assumption is precisely the reason that under *Batson* prosecutors are currently forced to explain the legitimate non-racial reasons for exercising their peremptory challenges once a prima facie case has been established.

Third, the state offers an alternative method for examining the data. Dr. Katz examines Mr. Briley's peremptory strikes by comparing Mr. Briley's strikes to the strikes of a hypothetical prosecutor who exercises his peremptory strikes solely on the basis of race. Dr. Katz's hypothetical prosecutor would never strike a white venire member if it would mean that the prosecutor would later have to forego striking a black venire member. Therefore, Dr. Katz constructed a model where the prosecutor used his strikes to strike only blacks with a singular goal of creating an all-white jury. Dr. Katz noted that Mr. Briley could have used 1,765 peremptory strikes,

not suggest that evidence of the prosecutor's behavior in certain cases is not relevant to helping divine the prosecutor's intent in the rest of the cases. Specifically, the Supreme Court has noted, in a separate context, that in our society interracial crime is treated differently than other crimes. *Turner v. Murray,* 476 U.S. 28, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986). Under our case law, a disparity in the prosecutor's use of peremptory challenges in either interracial crimes or in crimes where the defendant is black is insufficient by itself to demonstrate a *Swain* violation. However, such a disparity in conjunction with a showing in all of the prosecutor's cases may be sufficient to overcome the heavy burden of *Swain.* Such a showing in these cases is by no means required by our case law, but on the other hand, if the data is available, it is at the very least relevant.

**23.** Dr. Katz, incidentally, was the state's statistician in *McCleskey v. Kemp,* 753 F.2d 877 (11th Cir.1985) (en banc) *aff'd* 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).

**24.** Such a stipulation is binding on the state in this Court. *See Busby v. City of Orlando,* 931 F.2d 764, 770–771 n. 4 (11th Cir.1991).

but used only 1,411 strikes. Dr. Katz also notes that 966 (or 68.5%) of Mr. Briley's strikes were against black venire members and that a total of 752 black jurors sat in the various trials. Dr. Katz found that his hypothetical prosecutor, if confronted with the same choices as those presented to Mr. Briley, would have struck an additional 676 black venire members, leaving only 76 black jurors in the 183 trials. Dr. Katz concluded that Mr. Briley did not use his peremptory strikes solely to prevent black venire members from serving on juries.

The state's alternative methodology and statistics are helpful, but not dispositive. As is clear from *Willis* I, the goal of the statistical evaluation is to allow this Court to infer the prosecutor's intent. An examination of the number of black venire members that could have been struck, if that was the prosecutor's only goal, is a fair indicator of the prosecutor's intent.[25] We, however, do not find the state's numbers dispositive because we recognize that in the real world a prosecutor may have a number of concerns which may affect his or her decision to utilize a peremptory strike.[26] The problem implicit in *Swain* is that in the course of any strike or series of strikes the prosecutor may have legitimate, as well as illegitimate, motivations. This problem of mixed motives is precisely why we approach this analysis with a broad interpretation of relevance and we require the petitioner to carry a heavy burden.

We therefore examine both the state's statistics and Horton's statistics in order to infer the prosecutor's intent. We can conclude from the state's statistics that race was not the *only* factor that affected Mr. Briley's use of his peremptory strikes. From Horton's statistics, however, we cannot help but conclude that race was a very significant factor in Mr. Briley's decision-making process.[27] In short, we find that the statistical evidence is sufficiently strong "to overcome the presumption of propriety in which *Swain* clothes peremptory challenges." *Willis* I, 720 F.2d at 1220. We therefore can reasonably infer that Mr. Briley was exercising his peremptory challenges in order to deny blacks the "right and opportunity to participate in the administration of justice." *Swain*, 380 U.S. at 224, 85 S.Ct. at 838.

Because Horton has demonstrated a prima facie case, the burden shifts to the state to rebut this showing. Such a rebuttal can be accomplished in two ways. "First, [the prosecutor] may make 'a showing that racially neutral selection procedures have produced the [historical and systematic] disparity.' [Second,] the prosecutor [may] show neutral reasons for the striking of all the blacks in petitioner's trial itself." *Willis* I, 720 F.2d at 1220–21 (quoting *United States v. Perez–Hernandez*, 672 F.2d 1380, 1387 (11th Cir.1982)). The state admits that it cannot meet its burden

---

**25.** We note that our Court in *Willis v. Kemp,* 838 F.2d 1510 (11th Cir.1988) (*Willis* II), utilized a similar methodology and determined that the petitioner failed to establish a prima facie case under *Swain.* The state argues that *Willis* II stands for the proposition that the state's methodology is the only relevant methodology to be used in evaluating a *Swain* claim. The state is simply incorrect. The *Willis* II Court considered the state's methodology in conjunction with evidence of the prosecutor's strike rate. Moreover, *Willis* II never stated a preference for either methodology.

**26.** The record includes an extended discussion by Mr. Briley in which he explains how he uses his peremptory challenge. Mr. Briley stated that there are a number of factors and that the factors may be assigned different priorities in different cases. Moreover, Horton correctly argues that the state's methodology does not adequately summarize what occurred at the trials.

Horton argues that the hypothetical prosecutor might forego striking a potential black juror if the next venire member in the pool was also black. A peremptory strike of one black venire member, which results in a venire member being replaced by another black venire member, does not result in any change in the racial composition of the ultimate jury. Horton argues that the state's methodology is invalid unless the state can prove that the use of each of the so-called "wasted" peremptory strikes against one of the black venire members would actually alter the racial balance of the actual juries. While Horton's criticism is accurate, we find that the critique goes to the weight of the evidence, not the admissibility.

**27.** We recognize that because of the limits of statistics, Dr. Liberson was able only to reject the null hypothesis that race was not a factor in Mr. Briley's decision process.

of proof under the second method. Mr. Briley has not retained any of his notes from the voir dire, he has no independent memory of the strikes, and he can point to nothing helpful in the record explaining why he used nine of his ten strikes against black venire members. The state argues, however, that Mr. Briley employed "racially neutral selection procedures" that unfortunately had a disparate impact on black venire members.

■ In evaluating Mr. Briley's rebuttal it is appropriate to keep in mind that " 'testimony from the alleged discriminators should be viewed with a great deal of judicial scrutiny.' " *Id.* at 1221 (quoting *Perez–Hernandez,* 672 F.2d at 1387). Moreover, protestations of innocence and blanket denials of bad faith intentions are inadequate. *Id.* With this standard in mind, we note that Mr. Briley stated that he did not exercise his peremptory strikes on the basis of race. He claimed that he frequently relied upon local sheriffs and sheriffs' deputies for advice about venire members' reputations before striking any jurors.[28] Based on the advice of these officers, he claimed to strike individuals if they had a connection to the defendant, the defendant's family, or the defendant's attorney. He also struck jurors if they had a reputation for lawlessness. Under our standard of review, the state has not made a suffi-

cient showing. The only testimony comes from Mr. Briley. His answers are devoid of any specifics.[29] The state did not place into the record any voir dire excerpts or testimony from any of Mr. Briley's assistants explaining the strike pattern. The burden of proof is on the state, and the state has failed to carry it.

## B. *Ineffective Assistance of Counsel at Sentencing*

■ Horton claims that he received ineffective assistance of counsel during the sentencing phase of the trial. In order for Horton to prevail on this claim, he must establish that his trial counsel's performance was deficient and that this performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

### 1. The Performance Prong

*Strickland* held that in evaluating whether a trial counsel's performance was deficient, the counsel's performance must be evaluated for "reasonableness under prevailing professional norms." *Id.* at 688, 104 S.Ct. at 2065. Courts should presume effectiveness and should avoid second-guessing with the benefit of hindsight. *Id.* at 689, 104 S.Ct. at 2065. Specifically, *Strickland* encouraged reviewing courts to allow attorneys broad discretion to repre-

---

**28.** The record only partially bears out Mr. Briley's claims. Mr. Briley named several sheriffs and deputy sheriffs (some now dead) upon whom he relied for advice. In depositions, some of the sheriffs indicated that they occasionally would give Mr. Briley advice about the venire members' reputations. However, Mr. Briley listed specific cases where he relied on the officers' recommendations and the officers deny that they advised Mr. Briley in some of those cases. Furthermore, Deputy Sheriff Columbus Johnson described at least two of the venire members, whom he allegedly had told Mr. Briley to strike from one of the juries, as "pillars of the community."

**29.** Leaving aside Mr. Briley's comment about the venire member's reputation for lawlessness, Mr. Briley's main explanation is that the black venire members may know the defendant, the defendant's family, or the defendant's lawyer because of residential neighborhood patterns. First, venires are asked whether they have any such knowledge during the initial strikes for cause. Presumably, the excerpts from the voir

dires in those cases could bear out Mr. Briley's claim, but they never were placed in the record. Second, we would expect Mr. Briley's strike pattern to change in those cases in which the trial court granted a change of venue. Presumably, black individuals in the new location would not know the defendant or his family. Mr. Briley's strike pattern, however, did not bear out this assumption in the six trials where the venue was changed. The six trials were: the John Hightower trial, where 6 of 7 strikes were against blacks; the R.L. Wallace insanity proceeding, where 6 of 6 strikes were against blacks; the first R.L. Wallace trial, where 11 of 12 strikes were against blacks; the second R.L. Wallace trial, where 10 of 10 strikes were against blacks; the second Eddie Finney trial, where 8 of 8 strikes were against blacks; and the second Johnny Westbrook trial where 10 of 10 strikes were against blacks. We have no choice but to conclude that Mr. Briley's proffered reason was pretextual.

sent their clients by pursuing their own strategy. However, the Court recognized that merely invoking the word strategy to explain errors was insufficient since "particular decision[s] must be directly assessed for reasonableness [in light of] all the circumstances." *Id.* at 691, 104 S.Ct. at 2066.[30]

██ *Strickland* furthermore emphasized that an attorney's performance must be evaluated in light of "all the circumstances." *Id.* at 688, 104 S.Ct. at 2065. The state, however, reads this language to imply that we must evaluate an attorney's performance by examining his or her performance in its entirety and by viewing the whole trial as an indivisible unit. The state is simply mistaken. Our Circuit, on a number of occasions, has evaluated an attorney's performance during discreet portions of a trial without regard to the attorney's performance at other points during the trial. *See, e.g., Stephens v. Kemp,* 846 F.2d 642 (11th Cir.1988) (holding the attorney's performance during the penalty phase ineffective despite the fact that the attorney's performance during the guilt phase was effective). However, we have remained faithful to *Strickland's* command by evaluating all of the circumstances surrounding the attorney's performance during each discreet portion of the trial.

Horton claims that he received ineffective assistance of counsel during the sentencing phase of the trial. During the sentencing phase, his attorneys did not call any witnesses and they introduced no evidence. His attorneys waived their opening but gave a closing. In the closing, Mr. Wallace, one of Horton's attorneys argued five main points. The bulk of Wallace's time was spent reviewing the history of the death penalty in Georgia in an effort to teach the jury about the concept of the jury exercising controlled discretion and the idea that the death penalty should be used to punish society's worst crimes. Wallace argued that a shootout in the course of a

burglary was not the moral equivalent of torture or mass murder. Wallace further argued that Horton should not be executed merely because the victim turned out to be the district attorney. Wallace's second and third points were mentioned only in passing. Wallace briefly mentioned that, on the state of the evidence, no one really knows what happened the night of the murder and Wallace suggested that if a burglar had killed Horton, rather than the district attorney, the state would not be seeking the death penalty. Wallace's fourth point was that if the jury rejected the death penalty, Horton would spend the rest of his life in jail and that was adequate punishment. Wallace concluded by begging for mercy.

Horton argues that his attorney was ineffective because of four separate reasons. First, and most importantly, Horton's attorneys performed little pretrial investigation into mitigation and they introduced no mitigating evidence. During the state habeas corpus evidentiary hearing, Horton's two trial attorneys admitted that they performed no pretrial investigation into mitigating circumstances and that they performed hardly any investigation during the trial. The attorneys testified during this hearing that the only investigation that they conducted during the trial consisted of a phone call to Horton's mother the night before the penalty phase of the trial was set to begin. The attorneys asked Mrs. Horton whether she would attend the penalty phase and sit among the spectators. The attorneys remember her declining the request and they thought that she said something about having the flu. The attorneys testified that they asked Mrs. Horton no other questions and conducted no other investigation.

Also during the state evidentiary hearing, Horton's trial attorneys attempted to justify their conduct as the product of a "tactical decision." The attorneys testified

---

**30.** Our caselaw strongly insulates an attorney's strategic decisions from later review. *Middleton v. Dugger,* 849 F.2d 491 (11th Cir.1988). However, so called "strategic" decisions that are based on a mistaken understanding of the law,

*see Young v. Zant,* 677 F.2d 792 (11th Cir.1982), or that are based on a misunderstanding of the facts, *see King v. Strickland,* 748 F.2d 1462 (11th Cir.1984), are entitled to less deference.

that they did not put on mitigating evidence, or conduct any investigation, because they felt that mitigating evidence was appropriate only in gruesome cases involving torture. The attorneys thought that by arguing mitigating evidence the jury would somehow draw the implication that "it was a horrible [torture-filled] case when it wasn't." The state court found that the decision not to investigate mitigating evidence, not to place the evidence before the jury, and not to argue the evidence was a reasonable tactical decision.

■ This Court's review of an ineffective assistance of counsel claim is *de novo* because it is a mixed question of law and fact. *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Subsidiary factual questions found by state courts are entitled to a presumption of correctness under 28 U.S.C.A. § 2254(d) (West 1977). The question of whether a decision was a tactical one is a question of fact. *See Bundy v. Wainwright*, 808 F.2d 1410, 1419 (11th Cir.1987). Because there is support in the record for the state court's finding that this decision was tactical, we must presume the state court's finding of fact was correct. However, whether this tactic was reasonable is a question of law, and we owe neither the district court nor the state court any deference on this point. *See id.*

This tactical decision was unreasonable. First, Horton's trial attorneys completely misunderstood the purpose, under Georgia law, of presenting mitigating evidence. Mitigating evidence, when available, is appropriate in every case where the defendant is placed in jeopardy of receiving the death penalty. To fail to do any investigation because of the mistaken notion that mitigating evidence is inappropriate is indisputably below reasonable professional norms.[31] Second, our case law rejects the notion that a "strategic" decision can be reasonable when the attorney has failed to

investigate his options and make a reasonable choice between them. *See King v. Strickland*, 748 F.2d 1462, 1464 (11th Cir. 1984). In the case at hand, the attorneys began to follow one path, based upon a misinterpretation of the law, without ever evaluating the merits of alternative paths. We, therefore, cannot conclude, as the state urges us, that Horton's attorneys failed to introduce mitigating evidence because they believed that the evidence was too weak; his attorneys never investigated or evaluated the evidence.

Horton next argues that his trial attorneys' performance was unreasonable because passages from Mr. Wallace's closing argument virtually encouraged the jury to impose the death penalty. Mr. Wallace told the jury that "the one you judge is not a very good person ... I ask you for the life of a worthless man." And, the prosecutor's closing "made me hate my client. But then, I ... try to be reasonable about the whole situation; and I don't hate him as much ... Mr. Briley has admirably told you just exactly why it is that Jimmy Lee has got to die. And it becomes my turn to try and explain to you why you don't have to say he's got to die ... I find my task virtually impossible ... Maybe Mr. Briley is right, maybe he is not. Maybe he ought to die, but I don't know."

Third, Horton claims his attorneys took pains to separate themselves from him during the closing. Mr. Wallace explained that he and his co-counsel were appointed counsel; that they were local lawyers and not "bleeding heart, anti-death penalty lawyers"; that the reason they were representing Horton was because it was their "civic duty"; and they stated that they "have to deal with [the prosecutors] every day. It's important for me to stay in good with them. [I feel] there is a lot of peer pressure on me [but] nobody has tried to pressure me."

---

**31.** Moreover, Horton's trial attorneys' explanation that they thought that a discussion of mitigating circumstances would somehow imply that the case was torture-filled when it was not is unacceptable. A jury who has already heard the evidence during the guilt phase, including the coroner's report, obviously would know if the case involved torture. It is unreasonable to assume that a jury would somehow infer from the fact that the defense presented mitigating evidence that the defendant engaged in torture.

Finally, Horton complains that his attorneys should have devoted a larger portion of their closing argument to the possibility that Brown was the triggerman. In the jury charge during the guilt phase, the jury was instructed that it could have found Horton guilty either as the triggerman or as an aider and abettor. Horton complains that his attorneys should have argued a residual doubt theory. Horton's trial attorneys did mention residual doubt in their closing argument, though only in passing. Although one might prefer a thorough discussion of the facts of this case and a different attorney probably would have taken a different approach, we are unwilling to term this approach an unreasonable one. Because of the shortness of this particular penalty phase, the closing arguments quickly followed the jury's deliberation in the guilt phase. The jury was aware of the facts and only a passing reference to them would have been reasonable under the circumstances.

In conclusion, we find that Horton's trial attorneys' performance during the sentencing phase of the trial was unreasonable in light of prevailing professional norms. We find their performance unreasonable because they failed to investigate and present mitigating evidence. Mr. Wallace attacked his client's character and separated himself from his client. Even when we evaluate the performance in light of what they did well, we conclude that the performance was unreasonable.

### 2. The Prejudice Prong

In order for Horton to prevail on this claim, he must establish prejudice from his counsel's unreasonable assistance. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. A petitioner satisfies the prejudice prong of *Strickland* when he or she can show that the trial counsel's deficient performance deprived the defendant of "a trial whose result [was] reliable." *Id.* "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068.

Horton has met his burden of proof on the prejudice prong. Horton had mitigating evidence that could have been presented. Horton has gathered the affidavits of ten individuals who claim they would have testified if they ever were asked to testify. Horton evidently was a hard worker, was a good youth, and was able to provide for his common law wife and their daughter, and he successfully adjusted to previous stays in prison. Our Circuit has in the past held that a failure to present similar mitigating evidence at sentencing for a similar crime was sufficient to establish prejudice. *See Harris v. Dugger*, 874 F.2d 756 (11th Cir. 1989) (The defendant was sentenced to death for a murder which occurred during a thwarted robbery; we granted the writ because his counsel failed to proffer evidence that the defendant had a good family life.).

Moreover, Horton's counsel's argument to the jury raises the distinct possibility that portions of the closing argument encouraged rather than discouraged the jury to impose the death penalty. Wallace's attacks on Horton's character and his attempts to distance himself from his client could only have hurt Horton's cause. Given Wallace's failure to present mitigating evidence and his unfortunate comments, clearly there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. We therefore find that Horton received ineffective assistance of counsel at the sentencing phase of the trial.

### C. *Confrontation Clause*

Horton also raises a Confrontation Clause claim. Horton argues that his right "to be confronted with the witnesses against him" was violated when Hamp Davis was permitted to testify that Pless Brown told him that Horton was the triggerman. Davis testified that, several days after the shooting, Brown approached him in a bar and told him "Jimmy [Horton] did the shooting; [I] didn't do the shooting."

**1464**

██  Under Georgia law, this statement by Brown was admissible under the co-conspirator exception to the hearsay rule. *See Horton v. Kemp*, Civil Action No. 6252, slip op. at 45 (Butts County Ct., Nov. 7, 1986); *see also Chatterton v. State*, 221 Ga. 424, 144 S.E.2d 726 (1965). Under Georgia law, a statement by a co-conspirator is admissible as long as the co-conspirator's statement was made while "[t]he culprits [are] still concealing their identity." *Chatterton*, 144 S.E.2d at 732. The state habeas trial court found that the statement met the requirements of Georgia's co-conspirator hearsay exception. Horton does not argue that the Georgia courts have misapplied Georgia Law. He argues that this application violates the Confrontation Clause.

In *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the Supreme Court laid down general rules to mediate the apparent conflict between admissible hearsay and the requirements of the Confrontation Clause. *Roberts* held that the Confrontation Clause mandates that the government must demonstrate both that the defendant is unavailable and that the hearsay is marked with a sufficient " 'indicia of reliability' " to be deemed sufficiently trustworthy to be used in a prosecution. *Id.* at 66, 100 S.Ct. at 2539 (quoting *Mancusi v. Stubbs*, 408 U.S. 204, 213, 92 S.Ct. 2308, 2313, 33 L.Ed.2d 293 (1972). In *United States v. Inadi*, 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986), the Supreme Court modified *Roberts* by holding that the Confrontation Clause does not require the government to prove that the declarant is unavailable when the hearsay is admissible under the co-conspirator exception to the hearsay rule.

The Supreme Court in *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), returned to the trustworthiness requirement of *Roberts*. The Court in *Bourjaily* held that there is no need to make an independent inquiry into the reliability of a statement "when the evidence 'falls within a firmly rooted hearsay exception.' " *Id.* at 183, 107 S.Ct. at 2782 (quoting *Roberts*, 448 U.S. at 66, 100 S.Ct. at 2539). The *Bourjaily* Court held that statements which fall within the traditional common law co-conspirator exception to the hearsay rule are presumed to be sufficiently reliable to satisfy the trustworthiness prong of the Confrontation Clause. *Id.* The Court, however, carefully pointed out that the presumption does not apply to those trials conducted in states that have not adopted the common law formulation of the exception. Specifically it noted, in dicta, that the formulation used in Georgia, which is the one at issue in the case at bar, is sufficiently different to mandate a case by case evaluation of the hearsay for indicia of reliability. *Id.* The Court referred to *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970), where the Court evaluated the Georgia co-conspirator exception which admits hearsay from a co-conspirator when the statement was made after the termination of the conspiracy. Therefore, following the dicta in *Bourjaily*, Pless Brown's hearsay statement, made days after the robbery, must have sufficient indicia of reliability in order to comply with the requirements of the Confrontation Clause.

The state argues that any analysis into reliability is foreclosed by the plurality opinion in *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). The state mistakenly claims that *Dutton* stands for the proposition that Georgia's co-conspirator hearsay rule always complies with the requirements of the Confrontation Clause. The plurality,[32] however, stated that "[t]he Georgia statute *can* obviously have many applications consistent with the Confrontation Clause, and we conclude that its application *in the circumstances of this case*

**32.** Plurality opinions are only persuasive authority; they are not binding on this Court. *See Foster v. Bd. of School Comm'rs of Mobile County*, 872 F.2d 1563, 1569 n. 8 (11th Cir.1989); *Powers v. Alabama Dep't of Educ.*, 854 F.2d 1285, 1292 n. 11 (11th Cir.1988). However, the holding of the court precludes lower courts from reaching results at odds with a narrow reading of the question before the court. *Cf. Mandel v. Bradley*, 432 U.S. 173, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977) (per curiam) (instructing lower courts how to interpret summary affirmances and dismissals for want of a substantial federal question).

did not violate the Constitution." *Id.* at 88, 91 S.Ct. at 219 (emphasis added). Similarly, the Court in *Bourjaily* read *Dutton*'s plurality opinion to stand for the proposition that Georgia's unique hearsay exception must be evaluated for reliability on a case by case basis.

The *Dutton* Court held that the hearsay at issue did not violate the Confrontation Clause. The facts at issue in *Dutton*, however, differ significantly from the facts in this case. In *Dutton*, petitioner's co-conspirator, following his arrest, told another inmate that "if it hadn't been for that dirty son-of-a-bitch Alex Evans, we couldn't be in this [problem] now." The prosecution used this testimony, along with the testimony of nineteen other witnesses (including another co-conspirator), to prove that Evans over-reacted to a police stop by grabbing an officer's gun and then participating in the execution-style slaying of three officers. The Court held that the hearsay did not violate the Confrontation Clause for four reasons. Two of the four reasons help distinguish *Dutton* from this case. The Court in *Dutton* explained that the hearsay "contained no express assertion about past fact" because the jury had to infer past facts from the statement. *Id.* at 88, 91 S.Ct. at 219. Also, the Court focused on several indicia of reliability: the declarant had no apparent reason to lie to the other prisoner, the statement was spontaneous, and the statement was against the declarant's penal interest. *Id.* at 89, 91 S.Ct. at 220. The hearsay, in this case, is very different. Pless Brown told Hamp Davis that Horton killed the victim. This statement is "an express assertion about [a] past fact" and leaves nothing for the jury to infer. Moreover, the statement was mostly, if not wholly, exculpatory. Although one can infer from the statement that Brown participated in the burglary, the explicit content of the statement is wholly exculpatory for the *murder* charge.

▮▮▮▮ We find that the hearsay statements of Brown, as related by Davis, violated Horton's right to confront his accuser. Because the Georgia co-conspirator hearsay exception is much broader than the

traditional common law exception, this hearsay must be judged for reliability under the standards elaborated in *Dutton v. Evans.* Under these standards, the hearsay lacks sufficient indicia of reliability: the statement was not res gestae, it was not given under oath, it was not against penal interest, etc. Moreover, this statement was exculpatory. Also, it was made days after the crime while the press was intently following the massive police investigation that was then underway. Finally, it was made to a friend while the declarant and the witness were drinking together in a bar. Simply put, this is not the sort of evidence that can properly form the basis of a conviction.

In this case, we do not find this Confrontation Clause violation to be harmless. The case demonstrating that Horton was the triggerman was largely circumstantial and was fairly weak. The only direct evidence that Horton was the triggerman was Horton's and Brown's alleged statements to Davis. We are unable to conclude that the error of admitting unreliable hearsay in violation of the Confrontation Clause can be termed harmless.

### D. *Booth Error*

▮▮▮ Horton also complains that the trial court failed to instruct the jury that the "fact that the victim was the District Attorney ... is not to be considered by you as ... evidence in aggravation." Horton claims that the instruction is necessary because, during the trial, witnesses periodically referred to Thompson as the district attorney. The prosecutor referred to Thompson in his closing argument during the guilt phase as a "fellow district attorney" and a "hardworking district attorney." The prosecutor during his sentencing phase closing argument stated that "[a]lthough I knew and admired Don Thompson as a fellow prosecutor, I'm ... asking for the death penalty because Don Thompson was killed; not because the district attorney was killed."

Complaints about the failure to give proper instructions during sentencing can raise two types of errors: state law error

and constitutional violations. The Georgia Supreme Court has determined that this failure to charge did not violate state law. *See Horton v. State*, 249 Ga. 871, 295 S.E.2d 281 (1982). We are not free to second guess the Supreme Court of Georgia on this state law question. Horton claims that these repeated references to the victim's occupation somehow made the sentence of death arbitrary and capricious. We disagree. To the extent that he is alleging that the jury gave the victim's occupation undue weight, this problem was mitigated by an extensive voir dire in which Horton elicited a promise from each juror not to consider the victim's occupation and by Horton's closing argument in which he reminded the jurors of their promises. To the extent that Horton is arguing that this is a victim impact statement under *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), such a constitutional violation is no longer cognizable after *Payne v. Tennessee*, —— U.S. ——, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).

### E. *The Failure to Order a New Sentencing Hearing*

▆▆▆▆ Horton finally argues that the trial court's failure to grant a new trial to consider newly discovered evidence violates the due process clause. Eight months after his trial, Horton moved the trial court for a new sentencing hearing to consider some newly discovered evidence. Horton alleged that he recently discovered that Pless Brown, a few days after the shooting, confessed to Arthur Fryer that he, and not Horton, had actually shot Thompson. The trial court, following a hearing on this motion, denied Horton's motion for a new trial. The trial court reasoned that under Georgia procedural law, as set out in *Emmett v. State*, 232 Ga. 110, 205 S.E.2d 231 (1974), the new trial motion must be denied because there was evidence that Fryer told Horton about Brown's confession prior to the trial.[33]

Horton is attempting to challenge the application of the state's procedural rule as a violation of some general due process right to offer this exculpatory testimony. This case is controlled by the Supreme Court's decision in *Taylor v. Illinois*, 484 U.S. 400, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988). The Court in *Taylor* recognized that a complaint about a state procedural rule which limits a defendant's "right to offer testimony [is properly] grounded in the Sixth Amendment even though it is not expressly described in so many words." *Id.* at 409, 108 S.Ct. at 652. The Court, though, noted that the defendant's right to present testimony must be weighed against the state's need to enforce procedural rules and to conduct criminal trials in an orderly manner. *Id.* at 411, 108 S.Ct. at 653. The Court conducted such a balancing in *Taylor* and concluded that a trial court *could* exclude exculpatory evidence as a sanction for violating a valid discovery rule. Moreover, there was dicta in the opinion suggesting that the same result would occur in a case involving evidence discovered after the trial. *Id.* at 414, 108 S.Ct. at 655. Although the language is dicta in *Taylor*, we make it our holding. We hold that a state court may, in appropriate circumstances, apply its state procedural rules and exclude exculpatory evidence presented to the trial court after the completion of trial without necessarily running afoul of the Compulsory Process Clause of the Sixth Amendment as it is applied through the due process clause of the Fourteenth Amendment.

The Court in *Taylor* recognized that while a state court may, in general, exclude evidence under its procedural rules, the constitutionality of each case must be judged on its own facts. *Taylor* examined the rationale for the procedural rule at issue and then compared the facts of the case to the rationale. *Taylor* indicated that the rationale for excluding newly discovered evidence included the state's desire for finality, a strong presumption that jury verdicts are correct, and a suspicion that

---

**33.** Horton never told his attorney about Fryer's revelation. Fryer testified at this hearing that he could not be available for the trial because he was hiding from the police. By the time of this hearing, Fryer was in jail.

newly discovered evidence may be fabricated. *Id.* at 414 n. 18, 108 S.Ct. at 655 n. 18. In this case, the exclusion of the evidence did not violate the Sixth Amendment because there is a strong reason to suspect that Fryer may have fabricated the evidence in order to get Horton off death row. First, a few days after the shooting, Fryer told his friends a different story. At that time, Fryer said that Horton had told him that he, and not Brown, had shot Thompson. Second, before he agreed to testify, Fryer asked whether his testimony could be used against Brown. Fryer suggested that he was unwilling to testify about his alleged conversation with Brown if it would result in Brown's receiving extra punishment. Third, Fryer did not stick to one consistent story during his testimony; in several instances he altered minor corroborating details. We therefore find no constitutional violation in the Georgia state court's decision refusing to grant Horton a new trial.

## III. CONCLUSION

We AFFIRM the district court's decision not to grant the writ of habeas corpus on the basis of the denial of the new sentencing hearing and the failure to give the requested instructions.[34] However, we REVERSE the district court's denial of the writ on the basis of the *Swain* claim, the ineffective assistance of counsel at sentencing claim, and the confrontation clause claim. We REMAND this case to the district court with instructions to grant the writ conditioned on the state's right to retry the petitioner within a reasonable time.

---

34. The petitioner also raised in the district court nine other claims which were not appealed to this Court. Any claim that was raised below, but not discussed in this opinion, is waived.

# APPENDIX A

## JURY STRIKES IN ALL CAPITAL CASES TRIED BY JOSEPH BRILEY

### BALDWIN COUNTY

| Defendant | Def. Race | Victim Race | Year | Prosecution B-W-U | Defense B-W-U | Jury B-W-U | Alts. B-W-U |
|---|---|---|---|---|---|---|---|
| Hightower, John [tried in Morgan County on change of venue] | B | 3 B | 88 | 6-1-0 | 2-12-2 | 3-9-0 | |
| Hill, Tony | B | B | 79 | 9-1-0 | 1-18-1 | 2-10-0 | |
| Hill, 2d | | | 82 | 8-1-0 | 5-15-0 | 4-8-0 | |
| Legare, Andrew | W | B | 77 | 2-6-0 | 6-12-1 | 8-4-0 | |
| Legare, 2d | | | 82 | 5-5-0 | 9-9-1 | 10-2-0 | |
| Legare, 3d | | | 84 | 2-8-0 | 10-10-0 | 5-7-0 | 2-0-0 |
| Lewis, Frank | B | W | 76 | 6-2-0 | 4-13-2 | 4-8-0 | |
| Mason, Guy | B | B | 75 | 6-1-1 | 2-15-1 | 4-8-0 | |
| Mason, 2d | | | 83 | 9-1-0 | 2-17-1 | 5-7-0 | |

### BIBB COUNTY

| Defendant | Def. Race | Victim Race | Year | Prosecution B-W-U | Defense B-W-U | Jury B-W-U | Alts. B-W-U |
|---|---|---|---|---|---|---|---|
| Brown, Pless | B | W | 81 | 9-1-0 | 0-20-0 | 5-7-0 | |
| Horton, Jimmy | B | W | 81 | 9-1-0 | 1-13-8 | 0-12-0 | |
| Machetti, Rebecca A. [tried in Gwinnett County on change of venue] | W | 2 W | 83 | 0-7-0 | 0-16-4 | 0-12-0 | 0-2-0 |

## GREENE COUNTY

| Defendant | Def. Race | Victim Race | Year | Prosecution B-W-U | Defense B-W-U | Jury B-W-U | Alts. B-W-U |
|---|---|---|---|---|---|---|---|
| Parrott, K. | B | W | 74 | Info. not available | * * " | 1-11-0 | 1-1-0 |
| Peek, David | B | 3 B | 76 | 3-1-0 | 4-10-0 | 1-11-0 | 0-2-0 |
| Wallace, R.L. Special plea of insanity trial | B | B | 79 | 6-0 | 1-5 | 4-8-0 | |
| Wallace, R.L. - Trial [both trials in Baldwin County on change of venue] | | | | 11-1-0 | 4-18-1 | 4-8-0 | 0-2-0 |
| Wallace, 2d | | | 87 | 10-0-0 | 1-17-1 | 11-1-0 | 2-0-0 |
| Young, Charlie * | B | W | 76 | 10-0-0 | 0-20-0 | 1-11-0 | |
| Young, Derwin | B | W | 76 | 10-0-0 | 0-20-0 | 6-6-0 | |

\* Mr. Briley missed voir dire due to flu. George Lawrence, Sr. exercised jury strikes. Mr. Briley, however, did supervise the jury strikes.

## JASPER COUNTY

| Defendant | Def. Race | Victim Race | Year | Prosecution B-W-U | Defense B-W-U | Jury B-W-U | Alts. B-W-U |
|---|---|---|---|---|---|---|---|
| Walker, Vernon R. | B | W | 77 | 7-0-0 | 0-13-1 | 4-8-0 | 0-1-1 |

## JONES COUNTY

| Defendant | Def. Race | Victim Race | Year | Prosecution B-W-U | Defense B-W-U | Jury B-W-U | Alts. B-W-U |
|---|---|---|---|---|---|---|---|
| Finney, Eddie | B | W | 77 | 7-0-0 | 0-16-2 | 2-10-0 | |
| Finney, 2d [tried in Morgan County on change of venue] | | | 83 | 8-0-0 | 2-12-0 | 5-6-1 | |
| Gibson, Sam | B | W | 75 | 8-2-0 | 1-16-3 | 2-10-0 | |
| Westbrook, Johnny M. | B | 2 W | 77 | not | available | | |
| Westbrook, 2d [tried in Morgan County on change of venue] | | | 85 | 10-0-0 | 0-19-0 | 7-5-0 | |

## PUTNAM COUNTY

| Defendant | Def. Race | Victim Race | Year | Prosecution B-W-U | Defense B-W-U | Jury B-W-U | Alts. B-W-U |
|---|---|---|---|---|---|---|---|
| Amadeo, Tony | W | W | 77 | not | available | 7-5-0 | |
| Baker, Lilton | B | B | 79 | 5-6-0 | 13-11-0 | 1-11-0 | 1-1-0 |
| Evans, Jonny F. | B | W | 85 | 12-0-0 | 0-19-5 | 3-9-0 | 0-0-2 |

## WILKINSON COUNTY

| Defendant | Def. Race | Victim Race | Year | Prosecution B-W-U | Defense B-W-U | Jury B-W-U | Alts. B-W-U |
|---|---|---|---|---|---|---|---|
| Harrell, George R. | W | W | 79 | 6-4-0 | 4-8-1 | 6-6-0 | |