Thomas Dean STEVENS,
Petitioner–Appellant,

v.

Walter D. ZANT, Warden Georgia
Diagnostic and Classification
Center, Respondent–Appellee.

No. 91–8670.

United States Court of Appeals,
Eleventh Circuit.

July 31, 1992.

Rehearing and Rehearing En Banc
Denied Oct. 1, 1992.

Steven G. Reade, Arnold and Porter, Washington, D.C., John P. Batson, Augusta, Ga., for petitioner-appellant.

Susan V. Boleyn, State of Georgia Law Dept., Atlanta, Ga., for respondent-appellee.

Before TJOFLAT, Chief Judge, FAY and KRAVITCH, Circuit Judges.

FAY, Circuit Judge:

This case is an appeal from a denial of a petition for a writ of habeas corpus. The appellant, Thomas Dean Stevens, petitioned the United States District Court for the Southern District of Georgia pursuant to 28 U.S.C. § 2254. That court denied the appellant's petition, concluding that the nine claims raised did not warrant relief. On appeal, Stevens argues that the district court committed a variety of errors that require reversal. For the reasons that follow, we AFFIRM the denial of the petition for writ of habeas corpus.

## I. BACKGROUND

A. *Factual History*

(1) The Murder

Roger Earl Honeycutt, an Army private stationed at Fort Stewart, Georgia, was driving a taxicab for the D & M Cab Company on the night of September 4, 1977. Honeycutt often drove for D & M on nights and weekends, but the fare he picked up on that fateful night was not like his other fares. That fare would cost him his life.

Appellant Thomas Dean Stevens and his co-indictee, Christopher A. Burger, were both servicemen stationed at Fort Stewart, Georgia. On the night of September 4, 1977, these two men called for a Shuman Company cab. The cabdriver that responded to their call, however, was accompanied by a friend. The presence of two men in the cab posed an obstacle to the plans Stevens and Burger had for the cab, and accordingly, Stevens and Burger did not take the Shuman cab. Instead, they called another cab company, D & M Cab.

Honeycutt responded to the second call placed by Stevens and Burger, picking them up at Fort Stewart. Not long after leaving Fort Stewart, however, Stevens and Burger brandished two weapons—a knife and a knife sharpening steel. The two soldiers soon commandeered Honeycutt's cab and forced Honeycutt to give them whatever money he carried. The amount was less than $20. Stevens then forced Honeycutt out of his clothes and into the back seat of the cab. There, he forced Honeycutt to engage in acts of oral and anal sodomy. When Stevens was through sodomizing Honeycutt, he and Burger tied Honeycutt up with a microphone cord and locked him in the taxicab's trunk. Stevens and Burger then proceeded to the Savannah airport where they had agreed to meet their friend and squad leader, James Robert Botsford.

Botsford testified that after Stevens and Burger picked him up at the airport, Stevens recounted the events that had taken place earlier that evening, including the commandeering of the cab, the sodomizing of Honeycutt, and the confining of the bound Honeycutt within the trunk of the cab. Botsford testified that Stevens and Burger repeatedly called out to Honeycutt and that Honeycutt responded from within the car's trunk. When Botsford asked what Stevens and Burger planned to do with the cabdriver, Stevens snickered, "Maybe we should kill him."

Botsford, understandably alarmed, tried to persuade Stevens and Burger not to kill Honeycutt. He asked Stevens and Burger to free the cabdriver, telling them that he would not mention what they had done if they would only let the driver live. Because Stevens and Burger told him they would let Honeycutt go, Botsford thought that he had succeeded in getting them to abandon the notion of murder. He therefore chose not to report Stevens and Burger on that night.[1]

---

1. On the following night, Stevens and Burger visited Botsford and asked him whether he had said anything to anyone. When Botsford said that he had not, Stevens and Burger told him that they had freed Honeycutt and ditched the taxicab. Although Stevens and Burger had admitted committing acts of theft, sodomy, and abduction, Botsford did not go to the authorities

After dropping Botsford off at Fort Stewart, Stevens and Burger continued to drive around in the stolen taxi. They drove to Jesup where police officers saw the D & M taxicab at a convenience store near the murder site. Two men were observed in the taxi. Shortly thereafter, Stevens and Burger drove to a borrow pit or pond. There, they removed a CB radio from the stolen taxicab and wiped their fingerprints from the vehicle. Burger then started the taxicab and drove it into the pond. Confined within the trunk, Honeycutt drowned.

### (2) Stevens' Statement

On September 12, 1977, the United States Army's Criminal Investigation Division ("CID") arrested Stevens. After being apprised of his rights, Stevens indicated that he wished to speak to a lawyer before making a statement. Through an appointed military lawyer, Stevens then informed the CID that he did not wish to make a statement and that he did not wish to be questioned.

On the following evening, after it was determined that jurisdiction over Honeycutt's murder lay with civilian rather than military authorities, Stevens and Burger were transported to the Wayne County Correctional Facility. Because of the transfer to the jurisdiction and custody of civilian authorities, Stevens was no longer entitled to his military lawyer.

While in civilian custody, Stevens was again read his *Miranda* rights. Although it appears from the record that authorities in Jesup and Wayne County knew that Stevens had not given a statement to the CID, it is unclear whether they had any reason to believe that Stevens had requested a lawyer and asked not to be questioned. Stevens never mentioned these requests to the civilian authorities.

In any event, the police brought Stevens into a room where they were reviewing the statement that Burger had previously given to the CID. That statement was read aloud to Burger in Stevens' presence.

When the statement depicted the murder as Stevens' idea, Stevens began to protest. The police stopped Stevens' attempts to interrupt, however, telling Stevens that he should remain quiet because he had not wanted to speak earlier. Stevens was also told that, if he so desired, he could make a statement after the police finished going over Burger's statement. Stevens in fact chose to make such a statement. He was again read his *Miranda* rights, and he thereafter made a statement that was introduced at his trial.

### B. *Procedural History*

On January 26, 1978, a jury in Wayne County, Georgia convicted Stevens of capital murder and sentenced him to death. On direct appeal, the Supreme Court of Georgia affirmed Stevens' conviction, but vacated his death sentence due to defects in the jury charge. *Stevens v. State*, 242 Ga. 34, 247 S.E.2d 838 (1978). A second sentencing trial was concluded on July 19, 1979, again imposing the death sentence. This time, the Supreme Court of Georgia affirmed the sentence. *Stevens v. State*, 245 Ga. 583, 266 S.E.2d 194, *cert. denied*, 449 U.S. 891, 101 S.Ct. 251, 66 L.Ed.2d 118 (1980).

Within a few months, Stevens began what would become a series of collateral attacks against his conviction and sentence. On December 29, 1980, he filed his first petition for a writ of habeas corpus in the Superior Court of Butts County, Georgia. That petition, as later amended, was denied on March 19, 1981. The Supreme Court of Georgia then denied Stevens' application for a certificate of probable cause to appeal that dismissal.

On January 6, 1982, Stevens brought his claims to federal court, filing a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Southern District of Georgia. That petition, as later amended, was dismissed without prejudice for failure to exhaust state remedies. *Stevens v. Zant*, 580

---

until after he learned that a local cabdriver had been reported missing. Remembering Stevens' words and the events that Stevens had related,

Botsford apparently decided that it was time to contact the authorities.

F.Supp. 322, 329 (S.D.Ga.1984). Stevens then returned to state court to exhaust his state remedies.

On January 31, 1984, Stevens filed his second state habeas petition in the Superior Court of Butts County, Georgia. On September 10, 1984, that petition was dismissed. Although the Supreme Court of Georgia later concluded that Stevens' petition was not subject to dismissal, it affirmed the denial of habeas relief. *Stevens v. Kemp*, 254 Ga. 228, 327 S.E.2d 185 (1985). The United States Supreme Court later denied Stevens' petition for a writ of certiorari. *Stevens v. Kemp*, 475 U.S. 1031, 106 S.Ct. 1237, 89 L.Ed.2d 345 (1986).

On May 13, 1986, Stevens filed his second federal habeas petition in the United States District Court for the Southern District of Georgia. After some discovery, the district court held an evidentiary hearing on October 5, 1988. At that hearing, Stevens was given leave to amend his petition to include a Fifth Amendment claim. The petition was later dismissed without prejudice, however, because Stevens had failed to exhaust his state remedies on this new Fifth Amendment claim.

On April 6, 1989, Stevens filed his third petition for state habeas relief in the Superior Court of Butts County. Applying O.C.G.A. § 9–14–51, that court dismissed the petition as successive. When Stevens applied for a certificate of probable cause, the Supreme Court of Georgia denied the request.

Stevens then returned to federal court. On January 14, 1991, he filed the federal habeas petition that is the subject of this appeal. On June 27, 1991, the district court entered an order dismissing the petition. Stevens filed his notice of appeal from that order on July 26, 1991, and we granted Stevens a certificate of probable cause to appeal.

## II. DISCUSSION

On appeal, Stevens argues that the district court committed a number of errors in denying his latest federal petition for a writ of habeas corpus. First, Stevens argues that the district court erred when it concluded that his trial counsel was not constitutionally ineffective. Stevens then asserts that the district court committed error by concluding that, although the state trial court had committed a constitutional error in charging the jury, the jury charge was nonetheless harmless. Finally, Stevens contends that the district court erred by refusing to consider a new claim brought under the Fifth and Fourteenth Amendments and by not considering evidence submitted on the ineffective assistance of counsel claim.

### A. *Ineffective Assistance of Counsel*

Stevens' first argument on appeal is that the district court erred by concluding that Stevens was not deprived of his Sixth Amendment right to the effective assistance of trial counsel. Stevens maintains that his trial counsel, Robert Smith, was constitutionally ineffective because he: "(i) unreasonably failed to move to suppress Stevens' confession on the ground that it was obtained in violation of Stevens' rights under the Fifth and Fourteenth Amendments; and (ii) unreasonably failed to present evidence in mitigation of the sentence, despite the existence and availability of such evidence." Brief of the Appellant at 9.

In evaluating claims of ineffective assistance of counsel, we must follow the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under that test, the defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687, 104 S.Ct. at 2064. This initial inquiry requires us to determine whether the performance of Stevens' trial counsel was within the wide range of reasonably effective professional assistance. *Id.* at 687–88, 104 S.Ct. at 2064–65. In performing this inquiry, our review of counsel's performance is highly deferential. *Id.* at 689, 104 S.Ct. at 2065. In fact, we presume that counsel's performance was reasonably effective. *Id.*

The defendant must also make an affirmative showing that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687, 104 S.Ct. at 2064. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068.

■■■ This two-pronged *Strickland* analysis applies whether the ineffectiveness complained of occurred in the defendant's trial or in a subsequent adversarial sentencing proceeding. *Id.* at 695, 104 S.Ct. at 2068–69. However, in a challenge to the imposition of a death sentence, the prejudice prong of the *Strickland* inquiry focusses on whether "the sentencer … would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.*

### (1) Failure to Suppress Statement

■■ According to Stevens, trial counsel should have moved to suppress the statement that Stevens gave to the police on the basis that the police interrogated Stevens after he requested counsel and after he indicated that he did not wish to be questioned. Although Stevens' counsel in fact moved to suppress the statement, Stevens maintains that the legal theory upon which his counsel proceeded was completely inappropriate. As a result, Stevens claims that

the representation he received during both the guilt and penalty phases of his trial was constitutionally ineffective.

Although the district court found the performance of Stevens' trial counsel adequate, it seems to us that counsel should have been aware of cases such as *United States v. Jordan,* 557 F.2d 1081, 1085 (5th Cir.1977), *United States v. McCain,* 556 F.2d 253, 256 & n. 4 (5th Cir.1977), and *United States v. Priest,* 409 F.2d 491, 493 (5th Cir.1969). Counsel should also have been aware that these cases provided a legal basis within which to frame a tenable argument seeking the suppression of Stevens' statement.[2] Accordingly, it was unnecessary for counsel to have relied solely on the argument that Stevens' statement was the result of Burger's involuntary statement and, thus, suppressible as "fruit of the poisonous tree."[3] Without deciding whether Stevens' trial counsel failed to perform in a reasonably effective manner, we do acknowledge that this facet of Stevens' ineffectiveness claim presents a rather solid basis for arguing that counsel's performance was outside the wide range of reasonable professional assistance.[4]

Even if we were to conclude that Stevens' lawyer did fail to provide reasonably effective assistance, however, the failure to raise certain suppression arguments would not have affected the results of Stevens' trial. Similarly, actual suppression of Stevens' statement would not have made any difference. The evidence which the State presented was simply too strong.[5]

2. We express no opinion on the actual merit of such an argument. We note, however, that an additional issue of imputing knowledge from one sovereign (the United States) to another sovereign (Georgia) was present. It seems that Georgia law enforcement authorities did not know either that the U.S. Army had appointed military counsel for Stevens or that Stevens had informed the Army that he did not wish to be interrogated.

3. It seems counsel was not even aware of the weakness inherent in his "fruit of the poisonous tree" argument. *See United States v. Dowdy,* 486 F.2d 1042 (5th Cir.1973) (holding that standing to assert Fifth Amendment privilege is personal), *cert. denied,* 415 U.S. 992, 94 S.Ct. 1592, 39 L.Ed.2d 888 (1974); *Lively v. State,* 237 Ga. 35, 226 S.E.2d 581 (1976) (same).

4. Yet, we are not convinced that it would have been unsound strategy if defense counsel had sought to introduce Stevens' statement as exculpatory evidence tending to prove that Stevens lacked the intent to kill Honeycutt. Indeed, the defense has invoked Stevens' statement on numerous occasions, from the guilt phase of Stevens' trial right through to this appeal.

5. Although we do not reach the merits of Stevens' claim under the Fifth and Fourteenth Amendments, *see infra* Section II(C)(1), the evidence presented in this case would nonetheless have caused us to conclude that the asserted constitutional error was harmless beyond a reasonable doubt.

Stevens and Burger were out drinking together when they decided to rob a taxicab. They obtained a knife and knife sharpening steel with which to perpetrate the planned robbery. When a Shuman taxicab with an accompanied driver responded to their call, they chose another taxi. According to Botsford's testimony, Stevens and Burger showed him the knife and steel that they had used to commandeer the cab and rob Honeycutt. Stevens told Botsford that he forced Honeycutt to strip, searched Honeycutt's clothes for money, and then threw the clothes out the window of the cab. Stevens also told Botsford how he sexually assaulted Honeycutt before tying him up with the microphone cord from a CB radio and putting him, naked, in the taxicab's trunk. Botsford even heard the imprisoned Honeycutt respond from within the trunk when Stevens and Burger called out to him on a number of occasions.

During the ride from the Savannah airport to Fort Stewart, Botsford also learned from Stevens that Stevens thought Honeycutt should probably be killed. Botsford thought he had successfully persuaded Stevens and Burger that they should not kill the cabdriver, but he was wrong.

After leaving Botsford at Fort Stewart, Stevens and Burger were seen driving in the area where the taxicab was eventually located. The taxicab was found deep within a pond in Wayne County. The knife and steel were still in the area of the car where Botsford had seen Stevens place them. Honeycutt's clothes were found strewn along the roads near Fort Stewart. The CB radio from the taxicab was found in a car belonging to Christopher Burger's mother-in-law. Honeycutt's naked body was found locked within the trunk of the D & M cab, together with the microphone cord with which Honeycutt had been bound.

Given this evidence, we simply do not believe that the result of Stevens' trial would have been any different if counsel had moved to suppress Stevens' statement on the basis that Stevens' Fifth Amendment rights were not respected. There is certainly no reasonable probability that either the verdict or the sentence would have been any different. Accordingly, we agree with the district court's conclusion that Stevens was not entitled to relief on this facet of his ineffectiveness claim.[6]

(2) Failure to Present Mitigating Evidence

■■■ Stevens also argues, however, that his trial counsel was ineffective because he did not present any mitigating evidence during the penalty phase of the trial. Although mitigating evidence may be appropriate whenever a defendant faces the death penalty, see *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1516, 117 L.Ed.2d 652 (1992), trial counsel's failure to present mitigating evidence is not per se ineffective assistance of counsel. *See Davis v. Kemp*, 829 F.2d 1522, 1538 (11th Cir.1987), *cert. denied*, 485 U.S. 929, 108 S.Ct. 1099, 99 L.Ed.2d 262 (1988); *Stanley v. Zant*, 697 F.2d 955, 961 (11th Cir.1983), *cert. denied*, 467 U.S. 1219, 104 S.Ct. 2667, 81 L.Ed.2d 372 (1984); *see also Burger v. Kemp*, 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) (holding that trial counsel was not ineffective despite failure to present any mitigating evidence). Moreover, where mitigating evidence is not

---

**6.** We similarly reject those contentions of ineffectiveness premised on counsel's failure to investigate every event leading up to Stevens' statement. Although Stevens and his trial counsel discussed those events, Stevens' rendition of the facts apparently gave counsel no reason to suspect the voluntariness of the statement. Given that counsel received consistent information from Stevens and from the police, we cannot conclude that it was unreasonable for counsel to have relied on Stevens' representations that the statement was given only after Stevens waived his rights. *See* Tr. Evid. Hr'g at 117, 118, *Stevens v. Kemp*, No. CV–286–94 (S.D.Ga. Oct. 1988). "[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless ... counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066. In any event, as the preceding discussion demonstrates, any failure to fully investigate the statement would have been harmless.

presented for strategic reasons, great deference will be given to counsel's judgment. *See Clark v. Dugger,* 834 F.2d 1561, 1568 (11th Cir.1987), *cert. denied,* 485 U.S. 982, 108 S.Ct. 1282, 99 L.Ed.2d 493 (1988); *Lightbourne v. Dugger,* 829 F.2d 1012, 1025 (11th Cir.1987) ("A lawyer's election not to present mitigating evidence is a tactical choice accorded a strong presumption of correctness which is 'virtually unchallengeable.'"), *cert. denied,* 488 U.S. 934, 109 S.Ct. 329, 102 L.Ed.2d 346 (1988). Nonetheless, the mere incantation of "strategy" does not insulate attorney behavior from review; an attorney must have chosen not to present mitigating evidence after having investigated the defendant's background, and that choice must have been *reasonable* under the circumstances. *See Lightbourne,* 829 F.2d at 1025–26. As we said in *Horton v. Zant,* "[t]he question of whether a decision was a tactical one is a question of fact.... However, whether this tactic was reasonable is a question of law, and we owe neither the district court nor the state court any deference on this point." 941 F.2d at 1462 (citing *Bundy v. Wainwright,* 808 F.2d 1410, 1419 (11th Cir. 1987)).

■ Although Stevens' trial counsel had a clinical psychologist examine Stevens before trial, counsel chose not to ask that psychologist to testify during the sentencing phase of Stevens' trial. According to counsel's testimony at his deposition and at the district court hearing, counsel did not ask Dr. Joseph W. O'Haire to testify during either of Stevens' two sentencing proceedings because counsel feared the potential harm arising from the State's cross-examination of Dr. O'Haire. Counsel apparently believed that such potential harm could outweigh any benefit that could be derived from Dr. O'Haire's testimony. Specifically, Stevens' counsel believed that the State could turn Dr. O'Haire's opinions against Stevens to portray Stevens as the leader and mastermind of Honeycutt's murder and, thus, the more culpable of the two defendants. Counsel believed the State could accomplish this by focussing on certain conclusions reached by Dr. O'Haire, such as the conclusion that Stevens often felt he was "in charge" as he followed an unknown force and the conclusion that Stevens possessed a much higher I.Q. than Burger. It is the fear of such potential harm—not the belief that Dr. O'Haire's opinions were either inherently harmful to Stevens or of no benefit—that ultimately led counsel to decide against using Dr. O'Haire.[7] Certainly, the record does not reveal that counsel's fears were either unfounded or unreasonable. Although other attorneys may have chosen to hazard the perils of calling Dr. O'Haire to the witness stand, we simply cannot conclude that counsel's judgment was outside the wide range of reasonably effective professional assistance.

■ We also conclude that counsel was not ineffective for failing to present evidence of Stevens' troubled background. Trial counsel was undisputedly well acquainted with Stevens' past. He also recognized that evidence of that past could generate appreciable sympathy from a jury. Although counsel seriously considered presenting evidence of Stevens' troubled past, counsel ultimately chose not to present such evidence before either of the juries that sentenced Stevens.[8]

Although counsel did not locate all of Stevens' relatives or have them testify about Stevens and his past, we find that counsel provided reasonably effective assistance during Stevens' sentencing. Counsel spoke to Stevens about the importance of getting Stevens' relatives to appear in court so that the jury could at least see that there were people who cared what

---

7. It is this same fear that led Stevens' counsel not to submit evidence of Burger's psychological profile or history. He believed the introduction of such evidence, although mitigating, could play into the hands of the prosecution and its argument that Burger was little more than Stevens' willing pawn.

8. As an initial matter, we note that counsel acted well within the bounds of reasonable representation by not calling Stevens to testify about his past. Detailed prosecutorial inquiries into Stevens' acts of sodomy could have been highly prejudicial.

happened to Stevens. Stevens, however, only provided his counsel with the names of two family members: Bill Pence, his uncle, and Terry Stevens, his brother.[9] Both Stevens and his trial counsel telephoned Stevens' uncle and spoke to him on a number of occasions. Counsel also spoke to a man whom he believed was Stevens' brother Terry.[10] He implored those relatives with whom he spoke to come to Stevens' trial. Moreover, counsel continued these conversations with Stevens' relatives following the first trial and sentencing. From counsel's testimony at the habeas hearing in the district court, it appears that counsel was led to believe that at least some of Stevens' relatives would be present in court; indeed, counsel only learned shortly before the initial trial that none of Stevens' relatives would be present for the trial.[11] Under circumstances such as these, it seems that counsel acted reasonably in his efforts to obtain the in-court presence of at least some of Stevens' family members. From the interactions counsel had with Stevens and his family members, we cannot conclude that counsel was unjustified in believing that at least some of Stevens' family members would be present and available if they were needed in court.

Counsel nonetheless testified that, even if members of Stevens' family had been available during the sentencing proceedings, he might not have called them to testify about Stevens or his past. As a matter of sentencing strategy, counsel wanted to prevent the jury from concluding that Stevens had conceded the validity of the State's arguments—that Stevens had intended to kill Honeycutt. Counsel apparently feared that the jury would see any attempts to present mitigating evidence as little more than Stevens' attempt to offer an excuse for his intent to kill Honeycutt.

Counsel thus feared that presenting mitigating evidence would backfire and reinforce any negative jury perceptions regarding Stevens' intent or relative culpability. Because Stevens' case was submitted to the first jury on various theories and because that jury returned a general guilty verdict, it was not unreasonable for counsel to have maintained that Stevens' intent and relative culpability, even after conviction, remained below the level espoused by the State. Moreover, because counsel had observed the difficulty with which the first sentencing jury had returned the death sentence, counsel believed it was sound strategy in Stevens' case to avoid the presentation of "risky" mitigating evidence and to focus instead on the minimization of Stevens' role in the murder. Again, while other attorneys could well dispute the propriety of maintaining such a position during the sentencing phase of a capital case, we cannot conclude that counsel acted outside the wide range of reasonable professional conduct.

### B. *Sandstrom Claim*

#### (1) Constitutional Infirmity of the Jury Instruction

■ Relying on *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), and *Francis v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985), Stevens argues that his petition for writ of habeas corpus should have been granted because the trial court's jury instructions raised an impermissible presumption regarding Stevens' intent to kill Roger Honeycutt. Stevens points to the following portion of the charge:

Every person is presumed to be of sound mind and discretion. The acts of a person of sound mind and discretion are presumed to be the product of the per-

---

**9.** Stevens insisted that his father, who was seriously ill, not be contacted or told about the trial. After the first trial, however, counsel did speak to Stevens' father.

**10.** Terry Stevens insists that he was never contacted by trial counsel. However, after observing Terry Stevens on the witness stand, the district court found him lacking in credibility.

**11.** Counsel testified that "his people were coming, and then we found out—I found out through a phone call to me the day before or the night before, or some time, that they were not coming." Tr. Evid. Hr'g at 68, *Stevens v. Kemp*, No. CV–286–94 (S.D.Ga. Oct. 1988). The illness afflicting Stevens' father seems to have prevented the in-court presence of those family members who were going to attend the trial.

son's will. A person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts....

... Intent is always a question for the jury, and is ordinarily ascertained by acts and conduct. Intent may be shown in many ways, provided the jury finds that it existed from the evidence produced before you. It may be inferred from the proven circumstances, or by acts and conduct, or it may be presumed when it is the natural and necessary consequences [sic] of the act.

Trial Tr. at 396–97, *State v. Stevens*, No. 77–1641 (Wayne County Super.Ct. Jan. 1978).

Under *Sandstrom* and *Francis*, a jury instruction creating a presumption of intent violates the Due Process Clause of the Fourteenth Amendment when it directs "evidentiary presumptions ... that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime." *Francis*, 471 U.S. at 313, 105 S.Ct. at 1970. That is, the constitutional violation occurs when the presumption impermissibly shifts ·the burden of persuasion from the prosecution to the accused. The mere fact that the presumption may be rebutted does not cure this constitutional infirmity. *Id.* at 317, 105 S.Ct. at 1972–73.

As the district court pointed out in its order denying the petition for writ of habeas corpus, the challenged portion of the jury instruction in this case is nearly identical to the charge found unconstitutional in *Francis*, 471 U.S. at 311, 105 S.Ct. at 1969. Like the *Francis* instruction, this charge is constitutionally infirm because it was "cast in the language of command," *id.* at 316, 105 S.Ct. at 1972, directing the jury to *presume* either an intent to kill from acts having the natural and probable consequence of death or an intent to aid and abet in murder from acts having the natural and probable consequence of assisting a murder. *See id.* The charge thus shifts the burden of persuasion on the element of intent away from the State where the natural and probable consequence of the ac-

cused's action is either the death of the victim or assistance in the victim's murder. In this way, the challenged language serves to " 'undermine the factfinder's responsibility at trial, based on evidence adduced by the State, to *find* the ultimate facts beyond a reasonable doubt.' " *Id.* (quoting *Ulster County Court v. Allen*, 442 U.S. 140, 156, 99 S.Ct. 2213, 2224, 60 L.Ed.2d 777 (1979)).

Although the challenged portion of the jury charge directs this impermissible burden-shifting, we must still examine the jury charge as a whole before concluding our analysis. *Id.* at 315, 318–19, 105 S.Ct. at 1971–72, 1973–74. Even when viewed as a whole, however, the charge given in this case continues to suffer from the problems set forth in *Francis*. In short, there is a reasonable likelihood that the charge will lead jurors to erroneously conclude: (1) that proof of acts having the natural and probable consequence of death would presumptively prove beyond a reasonable doubt that Stevens intended to kill Honeycutt, and (2) that proof of acts having the natural and probable consequence of assisting in murder would presumptively prove beyond a reasonable doubt that Stevens intended to aid and abet in the murder of Honeycutt. Thus, the constitutional infirmity of this instruction cannot be remedied simply by examining the infirm language in the context of the full instruction.

(2) Harmless Error Analysis

 *Sandstrom* errors are nonetheless subject to the harmless error analysis of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *Rose v. Clark*, 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986). Such errors require a court to determine "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " *Yates v. Evatt*, —— U.S. ——, 111 S.Ct. 1884, 1892, 114 L.Ed.2d 432 (1991) (quoting *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828).

 In *Yates*, the Supreme Court described the nature of the harmless error

analysis which must be applied to *Sandstrom* errors:

> To say that an error did not contribute to the verdict is ... to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record. Thus, to say that an instruction to apply an unconstitutional presumption did not contribute to the verdict is to make a judgment about the significance of the presumption to reasonable jurors, when measured against the other evidence considered by those jurors independently of the presumption.

111 S.Ct. at 1893. The Court then set forth the two distinct steps that a reviewing court must follow in performing that analysis.[12]

The first step set forth in *Yates* requires a court to "ask what evidence the jury actually considered in reaching its verdict." *Id.* The court must then analyze the jury instructions, applying "that customary presumption that jurors follow instructions and, specifically, that they consider relevant evidence on a point in issue when they are told to do so." *Id.* The court then enters the second step of the *Yates* analysis, weighing the probative force of the evidence actually considered by the jury against "the probative force of the presumption standing alone." *Id.*

In recognizing the situations where *Sandstrom* errors may be harmless, the pre-*Yates* decisions of this circuit have stated the following:

> In applying harmless error analysis to *Sandstrom* violations, this court has identified two situations where the harmless error doctrine can be invoked: (1) where the erroneous instruction was applied to an element of the crime that was not at issue in the trial, or (2) where the evidence as to the defendant's guilt was overwhelming.

*Bowen v. Kemp*, 832 F.2d 546, 548 (11th Cir.1987) (en banc), *cert. denied*, 485 U.S. 940, 108 S.Ct. 1120, 99 L.Ed.2d 281 *and cert. denied*, 485 U.S. 970, 108 S.Ct. 1247, 99 L.Ed.2d 445 (1988); *see also Stephens v. Kemp*, 846 F.2d 642, 659 (11th Cir.), *cert. denied*, 488 U.S. 872, 109 S.Ct. 189, 102 L.Ed.2d 158 (1988); *Drake v. Kemp*, 762 F.2d 1449, 1453 (11th Cir.1985) (en banc), *cert. denied*, 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 738 (1986). After *Yates*, however, the *Sandstrom* errors subject to harmless error findings are somewhat different. For example, it is now clear that conclusions of harmless error are not appropriate simply because there is overwhelming evidence as to the defendant's guilt. The overwhelming evidence as to the defendant's guilt must actually have been considered by the jury. Thus, a reviewing court must determine "whether the force of the evidence presumably considered by the jury in accordance with the instructions is so overwhelming as to leave it beyond reasonable doubt that the verdict resting on that evidence would have been the same in the absence of the presumption." *Yates*, 111 S.Ct. at 1893–94. Yet, where *Sandstrom* errors have occurred, the two situations identified by this circuit continue to identify instances where harmless error analysis is appropriate.

We agree with the district court's opinion that "[i]n this case, because the defense counsel's strategy primarily focused on convincing the jury that Stevens' [sic] never intended to kill the victim, intent was definitely an issue at trial." Order at 73,

---

12. Although we acknowledge that the Supreme Court has disapproved of some of the language used in *Yates v. Evatt, see Estelle v. McGuire,* —— U.S. ——, 112 S.Ct. 475, 482 n. 4, 116 L.Ed.2d 385 (1991), we also conclude that *Yates* continues to guide the harmless error analysis applicable to *Sandstrom* errors.

*Estelle* criticized the "reasonable juror" language that *Yates* had used in determining whether an ambiguous jury charge was constitutionally erroneous. *Estelle* also affirmed that a reviewing court should not use the "reasonable juror" standard to determine whether an ambiguous jury instruction is unconstitutional, but that a court should instead determine "'whether there is a reasonable likelihood that the jury has applied the challenged [ambiguous] instruction in a way' that violates the Constitution." 112 S.Ct. at 482 & n. 4 (quoting *Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990)). Nonetheless, *Estelle*'s criticism did not reach or affect the harmless error analysis set forth in *Yates*.

*Stevens v. Kemp*, No. CV291–009 (S.D.Ga. June 26, 1991). Thus, in order to hold the error harmless, it is necessary to find that the jury actually considered overwhelming evidence of the defendant's intent to commit the crime charged. *See Yates*, 111 S.Ct. at 1893–94.

Because the jury returned a general verdict, it is unclear whether it found Stevens guilty of felony murder or malice murder. Of course, intent to kill is not an element of the crime of felony murder; therefore, the *Sandstrom* charge is undeniably harmless error if the jury found Stevens guilty of felony murder.

Intent to kill, however, is an element of malice murder; therefore, the *Sandstrom* instruction would be harmless only if there was overwhelming evidence of intent to kill. Here, the prosecution relied primarily on evidence of Stevens' intent to aid and abet Burger because in Georgia, one can be convicted of malice murder on a theory of accomplice liability. The trial court instructed the jury to find Stevens guilty if he had the intent to aid and abet Burger, and the district court presumed that the jury followed the trial court's instruction. Order at 74–75, *Stevens v. Kemp*, No. CV291–009 (S.D.Ga. June 26, 1991).

The district court pointed to Botsford's testimony that the idea of murder had originated with Stevens and to the enormous amount of circumstantial evidence as overwhelming evidence of intent either to kill Honeycutt or at least aid and abet Burger's actions. Specifically, the district court noted that Stevens:

> participated fully in the kidnapping of the victim, he directly committed the acts of sodomy, he tied the victim's hands and put him in the trunk of the car, he helped Burger wipe their fingerprints off the car, he sat and watched as Burger drove the car into the pond, he watched the car sink, and, finally, he ran away from the scene.

*Id.* at 76. Stevens essentially argues that the evidence of his intent was not overwhelming because the jury could have believed his version of the events. To do so, however, the jury would have had to accept the truth of his confession in its entirety, and infer from that confession that he did not intend to kill Honeycutt. The confession actually reads, in relevant part:

> Chris [Burger] was going to drive the car into the pond and I said do you think we should and he said yes I said I wouldn't do it and he said it always harder the first I didn't think he was going to but he got in the car drove it into the pond and jumped out of the car before it went in he took off running so I took off running too We stopped and Looked back and the car was sinking so we took off running. [sic]

State Ex. 29, *State v. Stevens*, No. 77–1641 (Wayne County Super.Ct. July 1979). The district court held that:

> [t]aken in context, no reasonable jury could have construed the words "I wouldn't do it" as evidence of Stevens' lack of intent.... Stevens' confession does not provide the jury with enough evidence from which to infer that he intended to do anything other than kill, or help Burger to kill, Honeycutt.... The jury could not rationally conclude that his bland comment, "I wouldn't do it," meant that he lacked the requisite intent, considering the evidence that Stevens aided in the crime before the murder, and aided Burger afterwards as well. He watched Burger drive the car into the pond; he watched as the car sank into the pond.

Order at 79–80, *Stevens v. Kemp*, No. CV291–009 (S.D.Ga. June 26, 1991).

We agree with the district court that the evidence considered by the jury overwhelmingly established the requisite intent required to convict Stevens of malice murder. Therefore, the *Sandstrom* error was harmless beyond a reasonable doubt.

### C. *Other Claims*

#### (1) Procedural Default

When considering state procedural requirements, the United States Supreme Court has explicitly stated:

> In all cases in which a state prisoner has defaulted his federal claims in state

court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, —— U.S. ——, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991); *see also Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 2506–07, 53 L.Ed.2d 594 (1977); *McCoy v. Newsome*, 953 F.2d 1252, 1258 (11th Cir.1992), *petition for cert. filed*, No. 91–7860 (U.S. Apr. 6, 1992). On appeal, Stevens nonetheless argues that the district court erred when it concluded that his claim under the Fifth and Fourteenth Amendments was procedurally barred by O.C.G.A. § 9–14–51.[13]

Stevens does not dispute that O.C.G.A. § 9–14–51 provides an independent state basis for procedurally barring consideration of the Fifth Amendment claim that Stevens failed to raise until his third state habeas petition. He contends, however, that O.C.G.A. § 9–14–51 is not an adequate basis for foreclosing his claim because the courts of Georgia have not applied the statute consistently in his case or in other cases. Stevens further contends that the courts of Georgia have been inconsistent in their applications of O.C.G.A. § 9–14–51 and res judicata principles, sometimes invoking the label of res judicata when applying O.C.G.A. § 9–14–51.

In support of his position, Stevens points to the manner in which the Superior Court of Butts County treated the ineffective assistance of counsel claim that Stevens raised in his second state habeas petition. In addition to reasserting ineffective assistance arguments that had already been raised in the first state petition, the second petition's claim was premised on additional facts and theories which Stevens had failed to raise in the prior state petition. Rather than addressing Stevens' claim simply by citing to O.C.G.A. § 9–14–51, however, the Superior Court of Butts County discussed broader principles of res judicata which served to bar consideration of the arguments raised in Stevens' ineffective assistance claim. The Georgia Supreme Court then affirmed the superior court's denial of habeas relief, concluding that Stevens' second ineffective assistance claim had been properly barred under applicable principles of res judicata, which included O.C.G.A. § 9–14–51. *Stevens v. Kemp*, 254 Ga. 228, 327 S.E.2d 185, 186–87 (1985). Stevens now maintains that, because the superior court applies res judicata but did not specifically apply O.C.G.A. § 9–14–51, his Fifth Amendment claim should only have been viewed as barred by res judicata.

In fact, neither the Georgia Supreme Court nor the Superior Court of Butts County expressly addressed the application of O.C.G.A. § 9–14–51 to the ineffective assistance issues which Stevens had failed to raise in his first state habeas petition. In his appeal to the Georgia Supreme Court, Stevens "d[id] not challenge the finding that his ineffective-assistance-of-counsel claims were ruled on in his original habeas petition." 327 S.E.2d at 187. Stevens' concession, unopposed by the State, thus allowed the court to rely on the uncontested finding and bar consideration of Stevens' ineffective assistance claims without reaching the express application of O.C.G.A. § 9–14–51. Under such circumstances, we cannot say that the Georgia courts' subsequent application of O.C.G.A. § 9–14–51 to bar consideration of the Fifth Amendment issues that Stevens had failed to raise earlier was inconsistent with the courts' use of Georgia law to bar consideration of the ineffective assistance claims that Stevens raised in his second state petition.

■ Furthermore, although Stevens makes much ado over whether Georgia courts have categorized their decisions as applications of res judicata or applications

---

**13.** O.C.G.A. § 9–14–51 provides that all grounds for habeas relief that are not raised in a petitioner's original or amended petition shall be waived: (1) "unless the Constitution of the United States or of [Georgia] otherwise requires," or (2) unless the grounds for relief "could not reasonably have been raised in the original or amended petition."

of O.C.G.A. § 9–14–51, "res judicata" is no more than a general label sometimes used by the Georgia courts to refer to the principles of claim and issue preclusion, which include the procedural default principles codified at O.C.G.A. § 9–14–51. *See, e.g., Tucker v. Kemp,* 256 Ga. 571, 351 S.E.2d 196, 197–98 (1987); *Stevens v. Kemp,* 327 S.E.2d at 186–87. Nevertheless, Stevens asserts that Georgia's application of res judicata principles will not act as a bar to federal habeas review, but that application of O.C.G.A. § 9–14–51 will bar review. Although state court decisions on the merits of a federal claim will not be given preclusive res judicata effect in a federal habeas proceeding, noncompliance with independent and adequate state procedural requirements will still normally preclude federal habeas review of the claim. *See Coleman,* 111 S.Ct. at 2554, 2565; *Wainwright,* 433 U.S. at 87, 97 S.Ct. at 2506–07; *McCoy,* 953 F.2d at 1258. In other words, principles of res judicata will not normally bar federal habeas review simply because state courts have considered the merits of a legal claim or issue. However, if the state has a rule of res judicata that precludes the review of issues not previously raised, the utilization of the "res judicata" label will not render inoperative the rule of *Wainwright v. Sykes.* Such principles of res judicata, as they affect issues not previously raised in a prior habeas petition, have been codified in Georgia's procedural default statute, O.C.G.A. § 9–14–51. Moreover, we have already recognized that noncompliance with O.C.G.A. § 9–14–51 can preclude federal habeas review. *McCoy,* 953 F.2d at 1257–62; *Lancaster v. Newsome,* 880 F.2d 362, 372–74 (11th Cir.1989); *Presnell v. Kemp,* 835 F.2d 1567 (11th Cir. 1988), *cert. denied,* 488 U.S. 1050, 109 S.Ct. 882, 102 L.Ed.2d 1004 (1989).

■ Despite Stevens' assertions, we conclude that the courts of Georgia have not applied O.C.G.A. § 9–14–51 in an inconsistent manner, whether in Stevens' case or in general. The statute provides an independent and adequate state basis for procedurally denying consideration of the Fifth Amendment issues that Stevens failed to raise until his third state habeas petition.

Moreover, Stevens has not shown the cause and prejudice necessary to overcome a procedural default. Neither has he shown that a fundamental miscarriage of justice will result if we do not consider his Fifth Amendment claim. Under these circumstances, the district court was correct in refusing to consider Stevens' claim under the Fifth and Fourteenth Amendments.

(2) District Court's Exclusion of Evidence

■ Stevens' final argument is that the district court erred in refusing to consider two documents tendered at the evidentiary hearing held on October 5, 1988. Those documents were the two declarations made by Dr. Joseph W. O'Haire in accordance with 28 U.S.C. § 1746. The first declaration, containing the opinions and explanations of Dr. O'Haire, had been made nearly two months prior to the hearing. Moreover, as evidenced by the second declaration, Stevens' habeas counsel had decided to use the first declaration in lieu of Dr. O'Haire's attendance as early as one week prior to the hearing. The declarations of Dr. O'Haire were offered to show that Stevens' trial counsel was ineffective by virtue of his decision not to call Dr. O'Haire to the witness stand. *See supra* Section II(A)(2) (addressing the pertinent ineffective assistance of counsel claim).

The State argued that it was never provided with a copy of Dr. O'Haire's declarations and that it was not even made aware of the documents until the federal habeas hearing. Under these circumstances, the State could not cross-examine Dr. O'Haire and could not adequately respond to the statements made in the declarations. Given the unfair surprise to the State, we do not find that the trial court abused its discretion in excluding the O'Haire declarations. This is especially true where the declarations would have had minimal impact upon Stevens' ineffectiveness claim. After all, it was not just the views that Dr. O'Haire had set down on paper that had stopped Stevens' trial counsel from calling Dr. O'Haire as a witness during the sentencing phase of Stevens' trial, but the fear that Dr. O'Haire's statements and perform-

ance on cross-examination could be used by the prosecution to create a prejudicial portrayal of Stevens' role in the murder, notwithstanding Dr. O'Haire's beliefs or his evaluation of Stevens' probable role in the murder.

### III. CONCLUSION

For the reasons set forth above, we find that the issues raised by the appellant, Thomas Dean Stevens, are without merit. Accordingly, we AFFIRM the denial of Stevens' petition for a writ of habeas corpus.