BARKETT, Circuit Judge,
dissenting:
The Supreme Court has ruled that it is critical to the reliability of a capital sentencing proceeding that the jury render an individualized decision. See Gregg v. Georgia, 428 U.S. 153, 206, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); Armstrong v. Dugger, 833 F.2d 1430, 1433 (11th Cir.1987). In this regard, the jury should consider and weigh the “particularized nature of the crime and the particularized characteristics of the individual defendant.” Gregg, 428 U.S. at 206, 96 S.Ct. 2909. Yet the “particularized characteristics” of Alex Williams, a 17-year-old boy at the time of the crime, have never been considered by any judge or jury in deciding whether the death penalty would be a constitutionally appropriate punishment. This absence of mitigating evidence is especially egregious in light of the Supreme Court’s conclusion that mitigating evidence is “particularly relevant” when considering whether or not to sentence to death a teenager with a family history of parental abuse. See Eddings v. Oklahoma, 455 U.S. 104, 116, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (finding “no doubt” that evidence of 16-year-old boy’s turbulent family history, beatings, and severe emotional disturbance should have been given weight as mitigation evidence because “[o]ur history is replete with laws and judicial recognition that minors, especially in their earlier years, generally are less mature and responsible than adults”). I therefore respectfully dissent.
At Williams’ trial, the only evidence of mitigation presented by trial counsel O.L. Collins was the extremely brief and superficial testimony of Williams’ mother and one friend, the extent of whose relationship with Williams was never established.[1] The essence of the mother’s brief testimony was that she may have been too “firm” with Williams at times, that he was a good boy who never talked back, and that he collects comic books and rare coins. His friend simply testified that they had skated together and that (notwithstanding the overwhelming evidence of guilt) she did not believe he had committed the crime. The only evidence Allen added at the new trial hearing to show that Collins was ineffective for failing to present more at the *1245 sentencing phase was the record from the Georgia Regional Hospital, where Williams spent a week less than a year before the crime, allegedly because “he wouldn’t mind his mother.” See Majority Op. 1231. Thus the comparison of aggravating and mitigating circumstances presented both by Collins to the judge and jury at trial and by Allen to the judge at the hearing on the motion for new trial was the rape and shooting of a young girl on the one hand and, on the other hand, Williams’ mother’s request that her son be spared essentially because he was a good boy who read comic books and never talked back.
This bland picture of Alex Williams, however, failed entirely to capture the reality of his young life. As the affidavits of Williams’ father and sister make clear, the mitigating evidence easily available[2] to either attorney at either phase, had they but made the effort to speak to other family members, would have painted an enormously different picture.[3] For example, Williams’ sister tells that when she and Williams were young, they were raised mostly by their grandmother, who “took everything out” on Williams. His grandmother beat him with a glass slipper and a tree limb. As for their mother, she would often disappear for days at a time. When Williams’ mother was home, she consistently whipped him if he did not “mind” her. A typical punishment for mistakes as small as missing curfew was to lock him out of the house. Once she gave them a choice between coming inside or being whipped with a barbell. Another time she “used a hammer and screw ... to make [Williams] mind her.” Often she used her hands or belts. Yet another time Williams’ mother locked him outside the house without any clothes on and told him “he would have to leave the same way he came into this world, naked.” Williams’ father confirms this abuse, saying that “[w]hen Alex was still little, I have seen Pat shake him until I thought his head would come off. I have seen her whip and beat him with such anger and vehemence you would think she was possessed by the devil.”
Even when locked outside the house naked, Williams’ sister says Williams “wouldn’t talk back or cry or yell or fight or nothing, even though he was old and big enough to help himself. He wouldn’t.... [H]e’d just leave the house for weeks at a time.” As Williams’ father similarly recalls, “Alex’s reactions to these abuses always shocked me. He hardly reacted at all. He would never talk back or try to get away. He’d take it, like he expected it. When he was young he’d go to his room and stay there for hours. As he got older, if he wasn’t thrown out, he’d disappear from the house for weeks at a time and even longer.” Both Williams’ sister and father, moreover, observed bizarre behavior on Williams’ part which signaled psychological problems. The sister remem *1246 bers her brother being obsessed with an inscrutable religion. “This was [Williams’] own religion and I didn’t understand it. I remember real well this one visit at the jail where ... [Williams] announced you are from the breastbone of your husband.” His father recalled his son having “crazy ideas” that he communicated with people without talking to them.[4]
None of this relevant evidence was presented at trial or at the motion for new trial. I believe this omission constitutes ineffective assistance of counsel on both the part of Collins and Allen. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), defines ineffectiveness of counsel as those “acts or omissions of counsel ... not to have been the result of reasonable professional judgment,” or which are “outside the wide range of professionally competent assistance.” Id. at 690, 104 S.Ct. at 2066. Certainly, as the majority suggests, whether a lawyer is generally competent and experienced may have some relevance to the question of whether that lawyer has provided effective assistance of counsel. It is axiomatic, however, both from our case law and from common sense, that notwithstanding general competence and success, a lawyer can fail to provide effective assistance of counsel in a given case. As the Supreme Court has explained, in making that determination, our job is to “keep in mind that counsel’s function ... is to make the adversarial testing process work in that particular case. ” Id. at 689, 104 S.Ct. 2052 (emphasis added). Thus, the narrow question before us is not Allen’s general competence, but whether in this particular case, his failure to conduct a reasonable investigation of mitigating circumstances constituted ineffective assistance of counsel. See Porter v. Singletary, 14 F.3d 554, 557 (11th Cir.1994) (“An attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant’s background, for possible mitigating evidence.”). More specifically, the question is whether the failure to interview Williams’ immediate family members, which would at the very least have disclosed the mitigating evidence described above and likely led to more, constitutes ineffective assistance of counsel.[5]
The majority, answering this question in the negative, does its best to justify Allen’s failure. The majority suggests that “to be effective a lawyer is not required to ‘pursue every path until it bears fruit or until all hope withers.’ ” Id. at 1237 (quoting Foster v. Dugger, 823 F.2d 402, 405 (11th Cir.1987)). It contrasts the resources Allen had available to him at the time of the new trial motion hearing with the more extensive “resources and time” available to Williams’ current “squad of attorneys.” *1247 Id. at 1236. It dismisses as “hindsight” the suggestion that Allen ought to have interviewed Williams’ father and sister. See id. at 1238-39 (quoting Strickland, 466 U.S. at 689, 104 S.Ct. 2052).
However, in offering these arguments, the majority misses the point. To provide effective assistance of counsel, Allen was not required to “ ‘pursue every [available] path.’” Majority Op. at 1237 (quoting Foster, 823 F.2d at 405). He was simply required to pursue the most obvious source from which all reasonable investigations into an individual’s character begin: the- family. Allen had all the time and resources he needed to perform this basic task. That he lacked a large law firm’s resources or a “squad of attorneys” is therefore irrelevant.[6]
Nor is it the case, as the majority suggests, that the implications of Allen’s failure to interview Williams’ immediate family members are obvious only in “hindsight.” Quite the opposite. Our circuit has long recognized that failing to interview family members is indicative of ineffective assistance of counsel. See Baxter v. Thomas, 45 F.3d 1501, 1513 (11th Cir.1995) (finding that reasonable investigation would have included family members where trial counsel spoke to defendant’s mother and brother, but not other family members); Blanco v. Singletary, 943 F.2d 1477, 1501-02 (1991) (counsel ineffective for failing to undertake investigation into mitigating evidence from family members); Harris v. Dugger, 874 F.2d 756, 763 (11th Cir.1989) (finding counsel deficient for neglecting to undertake investigation into family, military, and employment background); Elledge v. Dugger, 823 F.2d 1439, 1445 (11th Cir.1987) (finding counsel’s investigation unreasonable where counsel was aware of defendant’s difficult childhood, but “did not even interrogate [the defendant’s] family members to ascertain the veracity of the account or their willingness to testify”). The thinking behind these cases is reflected clearly in the seminal treatise advising lawyers on how to represent a death penalty client, Federal Habeas Corpus Practice and Procedure, which lists 17 major information sources necessary for fact gathering in post-conviction proceedings. Besides the client, the family is the most important source to look for relevant information when pursuing post-conviction relief in state or federal court.[7]
The majority makes much of Allen’s conferring with death penalty legal experts Stephen Bright and George Kendall. No doubt these experts, who are well aware of the importance of interviewing immediate family members in this context,[8] would have advised Allen to do so. In this case, *1248 however, the record is silent on the substance of Allen’s conversations with these admittedly eminent attorneys,[9] and in any event, the point is not whether Allen conferred with Bright and Kendall, but what Allen himself ultimately did or did not do. And what he did not do was interview the available members of Williams’ immediate family.
Moreover, plenty of red flags existed to place any reasonably effective lawyer on notice that family members would be indispensable to a basic investigation. At the time of the crime, Williams was an adolescent living at home, directly under his family’s influence. He had problems in school. He also had significant problems at home, as evidenced by the fact that he moved in for a time with his father. His return home at age 14 after 8 months with his father likewise suggests problems in his father’s home. It is important to keep in mind that Williams committed this crime at age 17. Given this time frame, it is unreasonable to suggest, as does the majority, that Allen need not have interviewed the father because Williams’ stay with him was too remote to matter.
Finally, Allen knew Williams was committed to a mental institution for an entire week, allegedly for intransigence, which on its face seems an implausible ground for committing someone to a mental institution. The majority argues that this evidence is of little value because Dr. Everett Kuglar (who in his affidavit makes clear that he had never seen or spoken with Williams) said that the report did not indicate that Williams suffered from a mental disorder or schizophrenia. However, as Allen himself has admitted, if Allen had talked to family members, he would have conveyed the information they provided to Dr. Kuglar, who without this information was unable to approach the report with any sort of contextual understanding. Dr. Kuglar himself testified by affidavit that the information attested to by Williams’ other family members[10] regarding Williams’ behavior suggested schizophrenia and that he would have had a very different conversation with Allen had he been aware of the information regarding Williams’ behavior at the time of the interview. Indeed, Kuglar directly states that had he “had the benefit of the foregoing information, [he] would have recommended that Allen secure a psychiatric examination for Alexander Williams.... ”
In making a reasonable effort to discover the source of a 17 year old’s violence, it is not enough, as Allen did, to take uncritically the brief comments of a single source, particularly someone who simple logic suggests could well have had a role to play in the conditions leading to Williams’ aberrant behavior.[11] In doing so, Allen repeated the same error made by Collins: notwithstanding the proximity of the family members, he failed to conduct a rudimentary investigation which would have discovered significant mitigating evidence. It is as unreasonable and ineffective to have omitted interviews with family members in this case as it would be for a lawyer to omit interviews with eyewitnesses to an accident in a negligence case.
Moreover, Allen’s failure is especially troubling in light of the fact that counsel was also on notice of potential psychiatric problems. Allen knew that Williams had been in the Georgia mental hospital less than one year before the crime.[12] This *1249 stay was not simply for an outpatient evaluation or one day of tests. He was there for an entire week. Universally, teenagers fail to mind their parents. But they ordinarily do not spend a week in a mental hospital because of it. This alone should have raised questions, and reasonable professional judgment would have dictated further investigation. See Baxter, 45 F.3d at 1513 (“[Bjecause defense counsel was aware that [the defendant] was behaving oddly and asked the court that [the defendant] be evaluated by a psychiatrist, they were on notice of potential psychiatric problems in [the defendant’s] background.”); Jackson v. Herring, 42 F.3d 1350, 1367 (11th Cir.1995) (finding investigation into mitigating evidence unreasonable where counsel “had a small amount of mitigating evidence regarding [the defendant’s] history, but ... inexplicably failed to follow up with further interviews or investigation”); Cunningham v. Zant, 928 F.2d 1006, 1018 (11th Cir.1991) (finding failure to present evidence concerning defendant’s mental retardation unreasonable “in light of the ready availability of this evidence”); Middleton v. Dugger, 849 F.2d 491, 493-94 (11th Cir.1988) (finding that counsel’s investigation was unreasonable where counsel failed to uncover “readily discoverable” mitigating evidence concerning defendant’s psychiatric problems).
Finally, Allen’s failure to investigate and present the mitigating evidence reflected in the affidavits could not possibly have been a tactical decision. First, a tactical decision must be an informed one. This is not a case of having the information and deciding not to present it, for Allen neglected to gather the relevant information in the first place. See Jackson, 42 F.3d at 1368 (“[A] legal decision to forgo a mitigation presentation cannot be reasonable if it is unsupported by sufficient investigation.”).[13] Moreover, Allen was not constrained by the tactical considerations of influencing a jury because his responsibility was to show that Collins was ineffective in adequately investigating the available mitigating evidence. Thus, Allen had nothing to lose and everything to gain by interviewing family members and obtaining a psychiatric evaluation of Williams.
Alexander Williams is entitled to have a jury deciding whether to impose a sentence of death consider the particularized characteristics of his young life at the time he committed the crime. For the reasons articulated above, I believe both Collins and Allen failed to provide Williams with effective assistance of counsel. Under Strickland, Williams must show that “there is a reasonable probability that but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Strickland, 466 U.S. at 694, 104 S.Ct. 2052. In my judgment, looking at the totality of the record I believe that there is a reasonable probability that but for Collins’ and Allen’s unprofessional errors, the results of the proceedings would have been different.[14] Collins’ failure to present the mitigating evidence a reasonable investigation would have unearthed undermines confidence in the outcome of the sentencing phase. Allen’s *1250 subsequent failure to take the steps reasonably required to prove Collins’ ineffectiveness in this regard undermines confidence in the outcome of the hearing on Williams’ motion for a new trial. Allen was therefore ineffective, and Williams is entitled to a new sentencing hearing.

. The majority opinion says the friend knew him "well,” but there is nothing in the penalty phase transcript to suggest close relations.

. Williams’ sister lives in the town where Allen works, and Williams’ father not far away. It would thus hardly take the resources of a big law firm, see Majority Op. at 1236, to perform the basic task of interviewing them. Indeed, the prosecution was able to find the sister and put her on the stand, so that she could testify to having seen a necklace belonging to the victim shortly after the murder.

. The majority suggests that this dissent advocates a "per se rule” that all lawyers must interview "every member of the defendant’s family for possible mitigating circumstances evidence." See Majority Op. at 1237-38. This grossly mischaracterizes the above discussion. There will indeed be situations where a failure to contact one or even more family members will, under certain circumstances, not constitute ineffective assistance of counsel. This, however, is not one of them. In the context of this defendant’s young life, it is not reasonable for a lawyer to ignore obvious indicators of mitigating evidence. For all the reasons described herein, such negligent ignorance flies in the face of common sense and practice, as well as what this circuit requires. See, e.g., Jackson v. Herring, 42 F.3d 1350, 1367 (11th Cir.1995) (Court found ineffective assistance of counsel where lawyer "had a small amount of information regarding possible mitigating evidence regarding [his client's] history, but ... inexplicably failed to follow up with further interviews and investigation.”)

. Had Collins and Allen obtained the information subsequently provided by Williams' sister and father, their 'interviews of the mother would have yielded completely different testimony to that which she initially provided. For example, in her subsequent affidavit, Williams’ mother testified that, when he was in jail for a minor offense during a period prior to the murder, her son told her that a light had appeared, and a voice spoke to him from it, when he was in his cell. Instead, to prepare for trial, Collins simply talked to the mother over the phone asking for names of people who would "say something nice about Alex.” The night before the sentencing phase, Collins merely told the mother to be ready to say something "nice about Alexander at the trial” and bring along others who might "say something nice.” Allen's recollection of his interview with the mother was that it did not consist of much more.

. The majority recognizes the fact that Allen only had 11 days to conduct the investigation. Allen did not, however, use the time he hád to conduct a reasonable investigation of Williams’ life. It is not unreasonable to expect that in 11 days Allen could have found time to talk to the father and sister, whose interviews might have served as a basis for a continuance to obtain mental health experts, or could have been forwarded to Dr. Kluger. Nor is it unreasonable to expect that Allen, who had already been working for a year on the motion for a new trial and was by his own admission intimately familiar with the transcript, should have devoted at least a good part of those 11 days entirely to investigating possible mitigating evidence. The majority mentions that the evidence of guilt was overwhelming, which is all the more reason why Allen should have spent this time concentrating on the sentencing phase.

. The suggestion that Allen’s failure to interview Williams' father and sister was a function of the resources available to him at the time is particularly implausible given their proximity.

. The 1988 version of this treatise reads as follows:
Potential sources of factual information include:
(A) The client.
(B) Members of the client's family, including:
1. Family members in contact with the client since trial
2. Family members who attended the trial
3. Family members in contact with the client at the time of the arrest and pretrial incarceration
4. Family members in contact with the client at the time of the offense
5. Family members in contact with the client at any time prior to the offense
2 James S. Leibman, Federal Habeas Corpus Practice and Procedure 737-38 (1988) (footnotes omitted).

. See Stephen B. Bright, Advocate in Residence: The Death Penalty As the Answer to Crime: Costly, Counterproductive and Corrupting, 36 Santa Clara L.Rev. 1069, 1085-86 (1996) ("The responsibility of the lawyer is to walk a mile in the shoes of the client, to see who he is, to get to know his family and the people who care about him, and then to present that information to the jury in a way that can be taken into account in deciding whether the client is so beyond redemption that he should be eliminated from the human community.”)

. The record gives no details as to what Allen discussed with Bright and Kendall. Allen merely says he "consulted at considerable length” with Kendall, and talked with Steve Bright "on numerous occasions.”

. For example, that Williams was obsessed by God, and that he had been visited by “a presence or a light” from which he heard a voice when he was in jail.

. Allen's experience as the former County District Attorney should have made him familiar with many cases in which the mitigating circumstances included abuse at the hands of one or both parents.

. Having read the trial transcript, Allen also knew that Jerry Donnell Smith had testified that Williams had told him that God had chosen the victim in this case.

. If the decision was a tactical one, it will usually be upheld, since counsel’s tactical choice to introduce less than all available mitigating evidence is presumed effective. See Jackson v. Herring, 42 F.3d 1350, 1366 (11th Cir.1995). "Nonetheless, the mere incantation of 'strategy' does not insulate attorney behavior from review; an attorney must have chosen not to present mitigating evidence after having investigated the defendant's background, and that choice must have been reasonable under the circumstances.” Stevens v. Zant, 968 F.2d 1076, 1083 (11th Cir.1992); see also Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir.1991) ("[0]ur case law rejects the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them.”).

. Moreover, we note that under Georgia law, the jury need not "balance aggravating against mitigating circumstances pursuant to any standard. In Georgia, juries may withhold the death penalty for any reason, or without any reason....” Smith v. Francis, 253 Ga. 782, 325 S.E.2d 362, 365-66 (Ga.1985).